UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ADAM BERKSON, *individually and on behalf of all others similarly situated*, and KERRY WELSH, *individually and on behalf of all others similarly situated*, <br><br> Plaintiffs, <br><br> – against – <br><br> GOGO LLC, and GOGO INC., <br><br> Defendants. | **MEMORANDUM & ORDER** <br> 14-CV-1199 |

**Parties**

Adam Berkson
Kerry Welsh

Gogo LLC
Gogo Inc.

**Appearances**

George Volney Granade, II
Michael Robert Reese
Reese LLP
875 Avenue of the Americas,
Suite 1808
New York, NY 10001
(212) 643-0500
ggranade@reeserichman.com
mreese@reeserichman.com

Anthony Joseph Laura
Epstein Becker Green
250 Park Avenue
New York, NY 10177
(212) 351-4500
alaura@ebglaw.com

JACK B. WEINSTEIN, Senior United States District Judge:

## Table of Contents

I.    INTRODUCTION ................................................................................................ 3
II.   PROCEDURAL HISTORY ................................................................................... 7
III.  FACTS ............................................................................................................ 8
    A.   Defendant Gogo ...................................................................................... 8
    B.   Monthly Service Charge .......................................................................... 9
    C.   Plaintiff Welsh ....................................................................................... 10
        1.   Sign-In Portal in August 2011 ........................................................ 12
        2.   Create Account Page ....................................................................... 14
    D.   Plaintiff Berkson .................................................................................... 15
        1.   Sign-In Portal in September 2012 ................................................... 16
        2.   Create Account Page ....................................................................... 18
    E.   Relationship Between Gogo Inc. and Gogo LLC .................................... 21
IV.   ASSESSING ATTRIBUTES OF THE "AVERAGE INTERNET USER" ..................... 21
    A.   Studies .................................................................................................. 21
    B.   Anecdotal Evidence ............................................................................... 27
    C.   The Reasonable Communicativeness Test ............................................. 27
V.    CONTRACT FORMATION AND ASSENT ......................................................... 30
    A.   Legal Research and Scholarship ............................................................ 30
        1.   "Informed Minority" Hypothesis .................................................... 31
        2.   American Bar Association Working Group ...................................... 32
        3.   Traditional Contract Doctrine and the Internet Age ...................... 33
    B.   Law ....................................................................................................... 38
        1.   Choice of Law ................................................................................ 38
        2.   Common Law Contracting .............................................................. 39
            a.   Acceptance ................................................................................ 39
            b.   Adhesion Contracts ................................................................... 39
            c.   Unconscionability ..................................................................... 43
                i.   Procedural ............................................................................. 44
                ii.  Substantive ........................................................................... 45
            d.   Material Terms and Material Alterations ................................... 46
            e.   Notice ........................................................................................ 48
        3.   Electronic Adhesion Contracts ....................................................... 50
            a.   Browsewrap ............................................................................... 50
            b.   Clickwrap .................................................................................. 54
            c.   Scrollwrap ................................................................................. 56
            d.   Sign-in-wrap ............................................................................. 58
            e.   General Principles ..................................................................... 61
        4.   Assessing Validity and Enforceability of Electronic Adhesion Contracts .................... 62
    C.   Application of Law to Facts ................................................................... 64
        1.   Plaintiff Welsh ............................................................................... 64
        2.   Plaintiff Berkson ............................................................................ 65
        3.   Generally ........................................................................................ 67

VI. CONSTITUTIONAL STANDING ........................................................................... 68
  A. Law ................................................................................................................ 68
    1. Motion to Dismiss Standard ..................................................................... 68
    2. Putative Class Representatives Cannot Be "Picked Off" by Defendants ....... 70
      a. Supreme Court Cases ...................................................................... 70
        i. *Deposit Guarantee Nat'l Bank v. Roper* ....................................... 70
        ii. *Genesis Healthcare Corp. v. Symczyk* ........................................ 72
      b. Relevant Court of Appeals Rulings ................................................. 73
        i. Offers of Judgment Must Fully Satisfy Claims ............................. 74
        ii. Acceptance of an Offer of Settlement Does Not Necessarily Moot a Case or Controversy .................................................................. 75
      c. Other Court Decisions..................................................................... 76
    3. Putative Class Representatives Cannot Be Paid Off By Sidestepping No-Contact Rule 78
  B. Application of Law to Facts ........................................................................... 80
    1. Plaintiff Welsh ......................................................................................... 80
    2. Plaintiff Berkson ...................................................................................... 80
VII. DISPOSITION OF REMAINING CLAIMS ............................................................. 82
VIII. CONCLUSION ................................................................................................ 83

## I.   INTRODUCTION

There is a huge percentage of the United States population using the internet for purchases.  *See infra* Part IV.  In many instances, these consumers are accepting important contracts of adhesion when they order a product or service through a computer.  With convenience has come much widened opportunities for consumer fraud and overreaching by merchants, as claimed in the present case.  The instant putative class action involves purchase of internet service connection ("Wi-Fi") on air flights.

Plaintiffs Adam Berkson and Kerry Welsh sue Gogo LLC and Gogo Inc. (collectively, "Gogo," "the company," or "defendants").  Alleged is that defendants improperly increased their sales and profits by misleading customers into purchasing a service that charged a customer's credit card, on an automatically-renewing continuing monthly basis, without adequate notice or consent.  The graphics and text on defendants' website, it is argued, led internet consumers during the proposed class period—between February 2008 and December 2012—to believe that they were only buying a one-month subscription when they signed up for in-flight Wi-Fi through

3

Gogo.  Gogo's position is that the terms plaintiffs consented to not only clearly provided for automatic renewal, but that they included mandatory arbitration and waiver of venue protection.

Berkson, a New York State resident, claims that he sustained unauthorized charges to his credit card on October 25, 2012, November 26, 2012, and December 25, 2012.  Welsh, a resident of California, posits that he suffered injury when he incurred unauthorized recurring charges over a sixteen-month span, from September 2011 through December 2012.

A variety of claims are pleaded in the amended class action complaint.  Three causes of action are brought on behalf of a nationwide class—common law breach of the implied covenant of good faith and fair dealing, common law unjust enrichment, and violation of various consumer protection statutes.  A New York sub-class is alleged to have a claim under the State's General Business Law, section 349.  Asserted on behalf of a California sub-class is violation of that State's Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.*, its Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*, and its False Advertising Law, Cal. Bus. & Prof. Code § 17500 *et seq.*

Before the court are defendants' three motions:  (1) to transfer venue; (2) to compel arbitration; and (3) to dismiss for lack of standing.

The motions to transfer venue and compel arbitration are premised on the company's "terms of use," which defendants argue plaintiffs assented to online when they subscribed to Gogo's in-flight Wi-Fi.  Plaintiff alleges that these terms and conditions were "hidden" and never seen, or agreed to, by them.  Hidden provisions in an electronic contract of adhesion do not bind the parties; they cannot dictate venue or compel arbitration.

The central factual-legal question in the case is:  were plaintiffs given effective notice of the need to make inquiry ("inquiry notice") of the "terms of use," in what can be characterized as Gogo's electronic contract of adhesion?  The question is answered in the negative, compelling denial of defendants' motions on venue and arbitration.

Plaintiffs' standing depends on whether they suffered concrete and particularized injury on the dates their credit cards were billed for allegedly unauthorized charges.  That Berkson was reimbursed by his credit card company when defendants refused to do so does not defeat his standing.  Nor has Welsh's standing been negated because, when put on notice of the class action lawsuit, Gogo directly sent him—not his attorney—a settlement offer in the form of a full refund.  Defendants' motion to dismiss for lack of standing is denied.

The case raises three policy questions:

- *First*, how should courts deal with hybrid versions of "browsewrap" and "clickwrap" electronic contracts of adhesion (referred to in this memorandum as "sign-in-wraps") that do not provide internet users with a compelling reason to examine terms favoring defendants?[1]

---

[1]     The terms "browsewrap," "clickwrap," "scrollwrap," and "sign-in-wrap" are defined *infra*, Part V.B.3. "The single common characteristic [of all 'wrap' contracts] is that the adhering party does not have to use a pen." Nancy S. Kim, *Wrap Contracts: Foundations and Ramifications* 3 (2013).

The "wrap" term originated in contract law from so-called "shrink-wrap agreements." *Id.* at 26.  "The term 'shrinkwrap' developed from retail software packages being covered in plastic or cellophane shrinkwrap and the agreements included with the software become effective once the customer tears the wrapping."  James C. Hoye, Click - Do We Have A Deal?, 6 Suffolk J. Trial & App. Advoc. 163, 165 n.16 (2001).  *See also ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1449 (7th Cir. 1996) ("The 'shrinkwrap license' gets its name from the fact that retail software packages are covered in plastic or cellophane 'shrinkwrap,' and some vendors . . . have written licenses that become effective as soon as the customer tears the wrapping from the package."); Kim, *Wrap Contracts*, at 3 ("Shrinkwraps are pieces of paper wrapped in plastic wrap that come with software compact discs.").

The word "wrap" that is associated with online internet contracts supports the colloquial description of a negotiation leading to a binding agreement as in the phrase "wrap something up," *e.g.*, "We're hoping to wrap up the negotiations this week."  Longman Dictionary of Contemporary English, http://www.ldoceonline.com/dictionary/wrap_1 (last visited Apr. 6, 2015).

- *Second*, if a credit card company reimburses an individual for losses, later claimed against a merchant, does full payment by the credit card company shield the vendor from liability to the consumer?

- *Third*, is the filing of a mandatory putative class action demand letter under a state's consumer protection statute the functional equivalent—for the purpose of providing notice—of a federal class action complaint?

In the absence of documentary, testimonial, or expert evidence about the expertise of these plaintiffs with respect to internet use, the court inferred their average capacity and understanding as internet users when they ordered Gogo's services. Relied upon were exploratory sociological research about average internet users, limited empirical studies conducted by legal scholars and economists, and somewhat arbitrary assumptions by the court itself about the average internet user.

It is concluded that the average internet user would not have been informed, in the circumstances present in this case, that he was binding himself to a sign-in-wrap. The sign-in-wrap used in this case does not support the venue and arbitration clauses relied upon by defendants. It was open to defendants to show special circumstances indicating that the plaintiffs were aware, or should have been aware, of such clauses because of their special knowledge, but they have not done so.

Applied is a four-part test to analyze the validity of electronic contracts of adhesion generally. *See infra* Part V.B.4. This approach casts significant doubt on the validity of those sign-in-wrap and clickwrap agreements that fail to adequately present material terms to internet users.

A putative class representative's standing is not eliminated when a credit company reimburses him for grievances later filed against a third-party merchant.  Credit card companies do not serve as shields for allegedly fraudulent merchants.

Filing of a mandatory putative class action demand letter under a state's consumer protection statute is the functional equivalent—for the purpose of providing notice—of filing a class action complaint in federal court.

Defendants' motions to transfer venue, compel arbitration, and dismiss the amended class action complaint are denied.

## II.    PROCEDURAL HISTORY

On February 25, 2014, Berkson filed a class action complaint in the United States District Court for the Eastern District of New York.  (Compl., Feb. 25, 2014, ECF No. 1.)  On behalf of a New York sub-class, he alleged violation of New York General Business Law section 349, and, on behalf of a nationwide class, he alleged breach of the implied covenant of good faith and fair dealing, and violation of various consumer protection statutes.  (*Id.*)  A fourth cause of action on behalf of the nationwide class, unjust enrichment, was alleged in the alternative.  (*Id.*)  On the same day, a motion for class certification was filed.  (Class Certification Mot., Feb. 25, 2014, ECF No. 5.)

On April 4, 2014, defendants filed a motion to compel arbitration or transfer the action to the Northern District of Illinois, or, alternatively, to dismiss the action for lack of jurisdiction or failure to state a claim. (Defs.' Mots. to Dismiss, Apr. 4, 2014, ECF No. 9.)

Three weeks later, on April 24, 2014, plaintiff Berkson, joined by plaintiff Welsh, filed an amended class action complaint adding three new causes of action for purported violations of several California statutes.  (Am. Compl., Apr. 24, 2014, ECF No. 17.)

On May 12, 2014, defendants filed a motion to compel arbitration or transfer the amended action to the Northern District of Illinois, or, alternatively, to dismiss the amended complaint for lack of jurisdiction or failure to state a claim. (Defs.' Mots. to Dismiss, May 12, 2014, ECF No. 21.)

Oral argument was heard on October 15, 2014.  (Hr'g Tr., Oct. 15, 2014 ("Hr'g Tr.").)  The parties were granted additional time to complete discovery and informed that the court would rule without further argument.  (*Id.* at 8:21–24.)  Discovery was completed four months later, on February 13, 2015.  (Order, Feb. 23, 2015, ECF No. 53.)  Supplemental briefing was concluded on March 27, 2015.  (*Id.*)

This memorandum is the court's written decision regarding the denial of defendants' three motions.  Defendants' may move for re-argument on the issue of standing since it was denied as moot at the October 15, 2014 hearing.  (Hr'g Tr. 10:3–12.)

III.    FACTS

   A.  **Defendant Gogo**

Gogo provides passengers with Wi-Fi access on many domestic airlines.  (Am. Compl. ¶ 22.)  Thirty-eight percent of domestic flights in the United States, 8,700 flights, offer Wi-Fi. (*Id.* at ¶ 2 (citing Joe Sharkey, *In-Flight Wi-Fi Still Costly, but More Available*, N.Y. Times, June 24, 2013, *available at* http://www.nytimes.com).)  Gogo dominates the market, making its service available on more than eighty percent of all Wi-Fi enabled flights in North America. (*Id.*)  "It is the 'exclusive internet access connectivity provider along domestic airlines routes flown by AirTran, Alaska Airlines, American Airlines, Delta, Frontier Airlines, United Airlines,

8

U.S. Airways, and Virgin America.'"  *Stewart v. Gogo, Inc.*, No. 12-CV-5164, 2013 WL 1501484, at *1 (N.D. Cal. Apr. 10, 2013) (citation omitted).

### B. Monthly Service Charge

At all times relevant to this action, Gogo's website advertised the cost of a monthly Wi-Fi subscription and the cost of a single day pass.  Monthly access cost approximately $40, and a day pass cost approximately $10.  (Am. Compl. ¶ 7; Steve Vair Decl. ¶¶ 3, 6, ECF No. 22 ("Vair Decl."); 2011 Create Account Page, ECF No. 30-1.)

It is alleged that, when potential customers registered for the monthly service, no notice was given about a recurring monthly charge.  (Am. Compl. ¶ 24.)  The only representation regarding the price indicated the charge per month—*i.e.*, "$34.95 per month" in the case of Berkson, and "$39.95 per month" in the case of Welsh.  (*Id.*; Vair Decl. ¶¶ 3, 6.)

Plaintiffs claim that they each purchased Wi-Fi from Gogo in reliance on representations they saw on the company's website.  (Am. Compl. ¶ 21.)  This information, they argue, led them to believe that, when they signed up for the service, they were only agreeing to a one-month subscription.  (*Id.*)  Gogo, it is alleged, obtained no signature or affirmative authorization to charge plaintiffs for recurring fees if they failed to cancel the service by phone.  (*Id.* at ¶¶ 21, 26.)  Nor did Gogo, it is claimed, send any communication to plaintiffs on a monthly basis, as is customary, to notify them of continuing new charges if the service was not cancelled by the subscriber.  (*Id.*)

After the month-long period from the date of original sign-up ended, Gogo continued to bill each of plaintiffs' credit cards monthly.  (*Id.* at ¶¶ 8, 15; Vair Decl. ¶¶ 5, 7.)  Only when the charges were recognized by plaintiffs was the unwanted service cancelled.  (*Id.*)

### C.  Plaintiff Welsh

According to Welsh, this is what occurred:  On August 7, 2011, he subscribed to Gogo's in-flight Wi-Fi on an Alaska Airlines flight from Los Angeles, California to Seattle, Washington. (Am. Compl. ¶ 15; Vair Decl. ¶ 6; Joint Submission 2, ECF No. 57 ("Joint Subm.").)  After purchasing what he believed to be a one-month package, he was billed, and his credit card charged, for the period of September 2011 through December 2012.  (Am. Compl. ¶ 15.)  Welsh never received any form of monthly bill or other communication from Gogo notifying him that he had signed up for automatic renewal of Gogo's internet service.  (*Id.*)

The allegedly unauthorized charges to his credit card stopped in February 2013, after Welsh complained to Gogo.  (*Id.*)  He was given a partial refund.  (Vair Decl. ¶ 9.)  He then hired counsel to represent him and other consumers allegedly misled by Gogo.  (Pls.' Mem. of Law in Opp. to Defs.' Mots. to Compel Arbitration, Transfer Venue, or, in the Alternative, Dismiss the Amended Class Action Complaint 28, ECF No. 29 ("Pls.' Opp.").)

On July 24, 2013, Welsh's counsel sent defendant Gogo LLC a pre-suit demand letter, as required by California's Consumers Legal Remedies Act (the "CLRA").  (CLRA Demand Notice ¶ 10, ECF No. 29-1; *see also* Cal. Civ. Code § 1782 (mandating that notice and demand be given by a consumer at least thirty days prior to commencing an action under the CLRA).)  In the letter, Welsh made demands on his own behalf and on behalf of consumers similarly situated, asking for a full refund of improper charges, as well as punitive damages, attorneys' fees, and costs.  (CLRA Demand Notice.)  It read as follows:

> Dear Sir or Madam:
>
> I send this letter to you, Gogo LLC ("Defendant"), on behalf of my client, Kerry Welsh ("Plaintiff"), and a proposed class of United States consumers who purchased one or more of your in-flight Internet services ("Services") at any time from July 25, 2009, to December 31, 2012 (the "Class") to advise you that Defendant has

10

violated and continues to violate California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq*., as well as various other state laws, as described in the enclosed draft Class Action Complaint (the "Complaint").  I ask that Defendant remedy such violations within thirty (30) days.

Defendant's violation of these laws stems from its deceptive representations with regard to Gogo in-flight Internet service.  In particular, Defendant marketed its Services without disclosing the fact that customers would be billed and charged for the Services on a recurring, monthly basis.  More specific details regarding the unlawful marketing of Defendant's Services are provided in the Complaint enclosed herein, which is incorporated by reference into this notice letter.

Defendant's unlawful practices, as described further in the Complaint, are prohibited by California Civil Code § 1770(a), in particular because Defendant, in marketing the Services:

- made deceptive misrepresentations about the Services;

- represented that the Services had characteristics, uses, or benefits that they did not have;

- advertised the Services with the intent not to sell them as advertised; and

- attempted to insert unconscionable provisions into contracts between Defendant and Plaintiff and between Defendant and other members of the Class.

My client will file the enclosed Complaint seeking, *inter alia*, monetary relief under the CLRA unless, within thirty (30) days, Defendant does the following:

- identifies all consumers similarly situated to Mr. Welsh, *i.e.*, all consumers who incurred monthly fees for Gogo in-flight Internet services for months that the consumers did not use the services, or make reasonable efforts to identify such consumers;

- notifies all consumers so identified that upon their request Defendant will refund to the consumers the price they inadvertently paid for Defendant's unauthorized charges;

- give any such requested remedy to the consumers in a reasonable amount of time; and

- immediately cease from engaging in the above-complained of methods, acts, or practices, or if immediate cessation is

11

> impossible or unreasonably expensive under the circumstances, then cease from engaging within a reasonable time.
>
> If Defendant fails to comply with this request within thirty (30) days, Defendant may be liable for the following monetary amounts under California's Consumers Legal Remedies Act:
>
> - actual damages suffered;
>
> - punitive damages;
>
> - costs and attorneys' fees related to suit; and
>
> - penalties of up to $5,000.00 for each incident where senior citizens have suffered substantial physical, emotional, or economic damage resulting from Defendant's conduct.
>
> I hope, however, that Defendant will choose to correct its unlawful practices promptly.  A failure to act within thirty (30) days will be considered a denial of my client's claims, and my client will act accordingly.  If you would like to discuss the matter, please do not hesitate to call me . . . .  Otherwise, my client and I look forward to Defendant's immediately changing its practices and compensating the above-identified individuals.

(*Id.*)

To this letter was attached a tentative federal class action complaint.  (*Id.*)  Gogo received the letter and attached complaint on July 30, 2013.  (Joint Subm. 3)  In August of 2013, in alleged violation of the attorney no direct contact with the client of opposing counsel rule, Gogo sent a refund check directly to Welsh without notifying his attorney.  (Vair Decl. ¶ 9; Pls.' Opp. 28.)

### 1.  Sign-In Portal in August 2011

In August 2011, when Welsh claims to have purchased Gogo's in-flight Wi-Fi, a potential user of the service was not required by Gogo to affirmatively assent to the website's "Terms of Use" when creating an account.  (2011 Create Account Page.)  If he wanted the service, the user could click on the box next to the statement, "I agree to the <u>Terms of Use</u>" and/or "I would like to receive email offers and news from Gogo."  (*Id.*)  Clicking on the box

12

next to "I agree to the Terms of Use" did not prompt the "Terms of Use" to appear on the screen

or prompt the e-mailing or mailing of the contract to the consumer.

It can be inferred that Welsh never clicked on this box.  (Kerry Welsh Decl. ¶¶ 4–11,

ECF No. 52-4.)  At the deposition of Gogo's corporate representative, the following exchange

took place:

> A:  There are certain fields a customer has to fill out and there are
>      certain fields that a customer doesn't have to fill out [on the
>      account creation page].
> . . .
> Q:  . . .  [I]s it correct that not all fields need to be filled out? . . .
> A:  That's correct.
> . . .
> Q:  . . . [T]he asterisk says, "Required Fields"?
> A:  It says, "Indicates Required Fields."
> . . .
> Q:  And there's a required field by "Name"; correct?
> A:  Yes.
>
> Q:  And "E-Mail"; correct?
> A:  Yes.
>
> Q:  "User Name"; correct?
> A:  Yep.
>
> Q:  But if there's not an asterisk, it's not required; correct? . . .
> A:  If there's [not] an asterisk, it doesn't require the user to input
>      text.

(Sladky Dep. 47:9–11, 49:11–15, 50:5–23, ECF No. 52-2.)

There is no asterisk next to the "I Agree to the Terms of Use" field or the "I would like to

receive email offers and news for Gogo" field.  (2011 Create Account Page.)

**2.  Create Account Page**

(*Id.* (emphasis and explanations added in red).)

Had Welsh clicked on the underlined phrase "Terms of Use," a hyperlink[2] would have been activated, connecting him to a separate screen where, after scrolling down to the eighth page of the document, he would have found this choice of law provision:

> **Governing Law and Venue.**  This Agreement shall be governed by the laws of the State of Illinois, without giving effect to any conflict of laws principles that may provide the application of the law of another jurisdiction.  The parties agree that any claim or dispute one party has against the other party arising under or relating to this Agreement (including claims in contract, tort, strict liability, statutory liability, or other claims) must be resolved exclusively by a court of competent jurisdiction, federal or state, located in Chicago, Illinois, and no other court.  Each party agrees to submit to the personal jurisdiction of such courts and to accept service of process from them.

(August 2011 Terms of Use 8, ECF No. 23-1 (emphasis in original).)

No arbitration clause was present in Gogo's "Terms of Use" in August 2011.  (*Id.*)

**D.  Plaintiff Berkson**

Berkson's statement of the facts is as follows:  On September 25, 2012, Berkson, a resident of New York, paid $34.95 to subscribe to Gogo's in-flight Wi-Fi on a Delta Airlines flight from New York, New York to Indianapolis, Indiana.  (Am. Compl. ¶¶ 7, 14; Vair Decl. ¶ 3; Joint Subm. 2.)  Berkson's credit card was billed $34.95 on September 25, 2012, October 25, 2012, November 26, 2012, and December 25, 2012.  (Vair Decl. ¶ 3.)  The total unauthorized charges he incurred from October through December 2012 amounted to $104.85.  (Am. Compl. ¶ 8.)  The charges to his credit card stopped after he complained to Gogo at or around "late December 2012."  (*Id.*; Joint Subm. 2.)

---

[2]        "The definition of a hyperlink is text or an image within a file on your computer that you can click on that gives access to another document or image.  *Words on a website that are underlined and highlighted in blue and that you can click on in order to open a new web page are an example of a hyperlink.*" YourDictionary, http://www.yourdictionary.com/hyperlink (emphasis in original) (last visited Apr. 6, 2015).

Berkson never received a monthly bill or other communication notifying him that he had signed up for automatic renewal of Gogo's in-flight Wi-Fi.  (Am. Compl. ¶ 9.)  He was not aware of the charges being made to his credit card (although, the court assumes he was likely to have received monthly statements from his credit card company indicating the monthly charge).

When he contacted Gogo to request a refund for the time periods he was charged for the service but did not use it, the company refused his request.  (*Id.* at ¶ 10; Joint Subm. 3.)

On January 7, 2013, American Express reversed Gogo's charges to Berkson's credit card. (Vair Decl. ¶ 4; American Express Refund Information, ECF No. 22-1.)

### 1.  Sign-In Portal in September 2012

In September 2012, the time period in which Berkson claims to have purchased Gogo's Wi-Fi service, a potential user was confronted with two sign-in buttons on the Gogo webpage. (September 2012 Sign-in Page 1, ECF No. 30-2 (emphasis and explanations added in red).)



The "SIGN IN" button in the upper right-hand corner sits alone.  (*Id.*)  No language either above it or near it requires a consumer to agree to any "Terms of Use."  (*Id.*)  Towards the bottom of the page, a second "SIGN IN" button appears.  (*Id.*)  Above this "SIGN IN" button, the website indicates:  "By clicking 'Sign in' I agree to the <u>terms of use</u> and <u>privacy policy</u>."  (*Id.*)  The "terms of use" and "privacy policy," which appear in lowercase and a font considerably smaller than the all caps "SIGN IN" button, appear to be hyperlinked, *i.e.*, the contractual terms will only be displayed to the user if he clicks on the underlined phrases, in this case "terms of use" or "privacy policy."  (*Id.*)  Clicking on the "SIGN IN" button does not display either the "terms of use" or Gogo's "privacy policy."  (*Id.*)

17

2.  **Create Account Page**

If a potential user wanted to sign up for use of Gogo's Wi-Fi in September of 2012, the below "create account" page would be activated by him to create a username and password:

(September 2012 Create Account Page 3, ECF No. 30-2 (emphasis and explanations added in red).)

This page told the consumer:  "By clicking 'NEXT' I agree to the terms of use and privacy policy." (*Id.*)  The "terms of use" and "privacy policy" would only be displayed if the

user clicked on these underlined terms.  (*Id.*)  Clicking on the "NEXT" button itself would not

present the "terms of use" or the "privacy policy" in a pop-up window; rather, it would merely

take the user to the following screen, which presumably asked for the user's credit card

information.  (*Id.*)

Had Berkson clicked on the "terms of use" hyperlink, after scrolling down to the seventh

page of the document, he would have found this choice of law provision:

> **Governing Law and Venue.**  This Agreement shall be governed
> by the laws of the State of Illinois, without giving effect to any
> conflict of laws principles that may provide the application of the
> law of another jurisdiction.   The parties agree that any claim or
> dispute one party has against the other party arising under or
> relating to this Agreement (including claims in contract, tort, strict
> liability, statutory liability, or other claims) must be resolved
> exclusively by a court of competent jurisdiction, federal or state,
> located in Chicago, Illinois, and no other court.  Each party agrees
> to submit to the personal jurisdiction of such courts and to accept
> service of process from them.

(September 2012 Terms of Use 7, ECF No. 23-2) (emphasis in original).)

An arbitration provision was not present in September 2012 when plaintiff Berkson

signed up for Gogo's Wi-Fi.  (*Id.*)  Such a provision was first inserted into the company's "terms

of use" in December 2012.  (December 2012 Terms of Use 7–8, ECF No. 23-3.)  The clause read

in part:

> It is Gogo's goal that the Site and the Service meet your
> expectations.  However, there may be instances when you have a
> problem or dispute that needs special attention.  In those instances,
> Gogo is committed to working with you to reach a reasonable
> resolution that satisfies you; however, we can only do this if we
> know about and understand your issue.  Therefore, for any problem
> or dispute that you may have with Gogo, you acknowledge and
> agree that you will first give Gogo an opportunity to resolve your
> problem or dispute.   This includes you first sending a written
> description of your problem or dispute . . . .

You then agree to negotiate with Gogo in good faith about your problem or dispute.  This should lead to resolution, but if for some reason your problem or dispute is not resolved satisfactorily within sixty (60) days after Gogo's receipt of your written description of it, you agree to the further dispute resolution provisions below.

You agree that the sole and exclusive forum and remedy for any and all disputes and claims that cannot be resolved informally and that relate in any way to or arise out of the Site, the Service or these Terms and Conditions, shall be final and binding arbitration. . . .

. . . As a limited exception to the agreement to arbitrate, you and we agree that you may take claims to small claims court, if your claims qualify for hearing by such court.

YOU HAVE A RIGHT TO OPT-OUT OF THIS ARBITRATION AGREEMENT.   IF YOU DO NOT AGREE TO THIS MANDATORY ARBITRATION PROVISION WITH REGARD TO ANY PARTICULAR INTERACTION WITH THE SITE OR THE SERVICE, THEN WITHIN THTRTY (30) DAYS FROM THE DATE OF SUCH INTERACTION, YOU MAY OPT-OUT OF THIS PART OF THE AGREEMENT . . . .   Any opt-out received after the thirty (30) day time period will not be valid and you must pursue your claim via arbitration pursuant to these Terms.

To the fullest extent permitted by applicable law, NO ARBITRATION OR OTHER CLAIM UNDER THIS AGREEMENT SHALL BE JOINED TO ANY OTHER ARBITRATION OR CLAIM, INCLUDING ANY ARBITRATION OR CLAIM INVOLVING ANY OTHER CURRENT OR FORMER USER OF THE SITE OR THE SERVICES, AND NO CLASS ARBITRATION PROCEEDINGS SHALL BE PERMITTED.  In the event that this CLASS ACTION WAIVER is deemed unenforceable, then any putative class action may only proceed in a court of competent jurisdiction and not in arbitration.

WE BOTH AGREE THAT, WHETHER ANY CLAIM IS IN ARBITRATION OR IN COURT, YOU AND GOGO BOTH WAIVE ANY RIGHT TO A JURY TRIAL INVOLVING ANY CLAIMS OR DISPUTES BETWEEN US.

(*Id.* (emphasis in original).)

### E.  Relationship Between Gogo Inc. and Gogo LLC

Plaintiffs assert that Gogo Inc. is the parent corporation of Gogo LLC.  (Am. Comp. ¶ 17 (citing Gogo Inc., Registration Statement (Form S-1) at 1 (Dec. 23, 2011), *available at* http://www.sec.gov).)  According to Gogo Inc.'s S-1 form filed with the United States Securities and Exchange Commission on December 23, 2011, Gogo Inc. and its subsidiaries are a combined entity.  (*Id.*)  Together, they offer "a full suite of in-flight internet connectivity and other voice and data communications products and services."  (*Id.*)

## IV.  ASSESSING ATTRIBUTES OF THE "AVERAGE INTERNET USER"

In the absence of expert reports comparing the average North American internet user's understanding of websites' "terms of use" to that of the plaintiffs in this suit, the court consulted available empirical and academic sociological studies.  It did this to formulate an acceptable understanding of the knowledge reasonably attributable to today's "average internet user" regarding electronic contracts of adhesion to obtain Wi-Fi connections on North American air flights.  Social science research in the form of consumer surveys have been used in American courts for decades.  *See*, *e.g.*, *Zippo Mfg. Co. v. Rogers Imports, Inc.*, 216 F. Supp. 670, 682 (S.D.N.Y. 1963) (holding that "[t]he weight of case authority, the consensus of legal writers, and reasoned policy considerations all indicate that the hearsay rule should not bar the admission of properly conducted public surveys").

### A.  Studies

The studies proved inadequate.  Those located generally fell into four categories:

- The demographics of the average United States internet user.  *See*, *e.g.*, Pew Research Center, *Internet User Demographics*, (January 2014) (reproduced below) (showing the large percentage of the adult population in the United States using the

internet in 2014), *available at* http://www.pewinternet.org/data-trend/internet-use/latest-stats (last visited Apr. 6, 2015).

## Internet users in 2014

*Among adults, the % who use the internet, email, or access the internet via a mobile device*

| | Use internet |
|---|---|
| **All adults** | **87%** |
| **Sex** | |
| a Men | 87 |
| b Women | 86 |
| **Race/ethnicity*** | |
| a White | 85 |
| b African-American | 81 |
| c Hispanic | 83 |
| **Age group** | |
| a 18-29 | 97[cd] |
| b 30-49 | 93[d] |
| c 50-64 | 88[d] |
| d 65+ | 57 |
| **Education level** | |
| a High school grad or less | 76 |
| b Some college | 91[a] |
| c College+ | 97[ab] |
| **Household income** | |
| a Less than $30,000/yr | 77 |
| b $30,000-$49,999 | 85 |
| c $50,000-$74,999 | 93[ab] |
| d $75,000+ | 99[ab] |
| **Community type** | |
| a Urban | 88 |
| b Suburban | 87 |
| c Rural | 83 |

Source, Pew Research Center Internet Project Survey, January 9-12, 2014. N=1,006 adults. Note: Percentages marked with a superscript letter (e.g., [a]) indicate a statistically significant difference between that row and the row designated by that superscript letter, among categories of each demographic characteristic (e.g., age).
* The results for race/ethnicity are based off a combined sample from two weekly omnibus surveys, January 9-12 and January 23-26, 2014. The combined total n for these surveys was 2,008; n=1,421 for whites, n=197 for African-Americans, and n=236 for Hispanics.

**PEW RESEARCH CENTER**

- The eye-tracking tendencies of the average internet user and the quantity of information read and processed by her.  *See*, *e.g.*, Jakob Nielsen, *F-Shaped Pattern for Reading Web Content*, Nielsen Norman Group (April 17, 2006) (images of eye-tracking heat map study reproduced below ("[A]reas where users looked the most are colored red; the yellow areas indicate fewer views, followed by the least-viewed blue areas. Gray areas didn't attract any fixations.")), *available at* http://www.nngroup.com/articles/f-shaped-pattern-reading-web-content (last visited Apr. 6, 2015); Jakob Nielsen, *How Little Do Users Read?*, Nielsen Norman Group (May 6, 2008) (empirical analysis finding that internet users on average read approximately twenty percent of the words on a webpage during an average visit), *available at* http://www.nngroup.com/articles/how-little-do-users-read (last visited Apr. 6, 2015).



- How text read on paper versus onscreen produces different levels of reading comprehension.  *See*, *e.g.*, Ferris Jabr, *The Reading Brain in the Digital Age: The Science of Paper Versus Screens*, Sci. Am. (Apr. 11, 2013) (collecting and discussing studies about print versus onscreen reading behavior), *available at* http:// www.scientificamerican.com/article.cfm?id=reading-paper-screens (last visited Apr. 6, 2015).

- How the average internet user interacts with privacy policies, web-based advertisements, and hyperlinks.  *See*, *e.g.*, Tamara Dinev and Paul Hart, *Internet Privacy Concerns and Social Awareness as Determinants of Intention to Transact*, 10 Int'l J. of Elec. Comm. 7, 19 (2005) (finding that privacy concerns have a minimal effect on how the average internet user engages in online transactions); Ralph Breuer, Malte Brettel, Andreas Engelen, 22 Mktg. Letters, *Incorporating Long-term Effects in Determining the Effectiveness of Different Types of Online Advertising*, 327, 336–38 (2011) (finding that online advertising has both short-term and long-term effects on sales, but that the duration and intensity of those effects differ for each online ad channel, *e.g.*, emails have the longest effect, followed by banner advertising and price comparison advertising); Florencia Marotta-Wurgler, *Does Contract Disclosure Matter?*, 168 J. of Institutional and Theoretical Econ. 94, 94 (2012) (empirical analysis showing that increasing ease of access to online contract terms via hyperlinks had negligible impact on whether terms were read by the average internet user).

*See also generally* Tony Haile, *What You Think You Know About the Web Is Wrong*, TIME (March 9, 2014) ("We are getting a lot wrong about the web these days.  We confuse what people have clicked on for what they've read.  We mistake sharing for reading.  We race towards new trends . . . without fixing what was wrong with the old ones and make the same mistakes all over again."), *available at* http://time.com/12933/what-you-think-you-know-about-the-web-is-wrong (last visited Apr. 6, 2015).

Of the studies located, none assessed what the average internet user perceives to be the meaning of the phrase "terms of use" or "terms and conditions," or the degree to which he or she is aware that each time a purchase is conducted over the internet, a binding contract regarding more than just the promise to pay may be being entered into.  *See generally* Juliet M. Moringiello, *Notice, Assent, and Form in a 140 Character World* 10, Sw. L. Rev., forthcoming (calling for "the need for research in areas outside of the law in order to determine how readers perceive online terms"), *available at* http://ssrn.com/abstract=2491249 (last visited Apr. 6, 2015).

Undiscussed by courts is what the average internet user, one who does not necessarily conduct much of her business online, perceives to be the purpose of a website's "terms of use." Especially when presented in lowercase, this phrase does not clearly inform a user that she is subjecting herself to a one-sided contract that purports to modify her basic legal rights and remedies.  Left to surmise is whether the average internet user's perception is aligned with the real-life implications contained in the text of these terms.

Courts have "decided," based largely on speculation, what constitutes inquiry notice of a website's "terms of use."  *See infra* Part V.B.2.e & 3.  Reliable scientifically-based studies assessing the types of visual and written cues that put a representative sample of American

society, *i.e.*, the average internet user, on actual notice of the importance and ramifications of "terms of use" have yet to appear.  Victoria C. Plaut and Robert P. Bartlett, III made an attempt in 2012, but their study is not based on the average internet user in the United States.  *See* Victoria C. Plaut and Robert P. Bartlett, III, *Blind Consent? A Social Psychological Investigation of Non-Readership of Click-Through Agreements*, 36 L. & Human Behav. 293, 310–11 (2012) (empirical psychological study finding that, while undergraduate university students overestimated their understanding of electronic standard form contract terms and self-reported a low incidence of reading terms, making the terms succinct and easily readable increased rates of reading, comprehension, and possible rejection of the terms by study participants) (image of table showing rate of students' self-reported incidence of reading electronic standard form contracts reproduced below).



One study that might be replicated in the context of electronic contracts of adhesion was published by Tess Wilkinson-Ryan based on printed standard form contracts.  *See* Tess Wilkinson-Ryan, *A Psychological Analysis of Fine Print*, 99 Iowa L. Rev. 1745, 1764–65, 1773–

74 (2014) (empirical psychological study finding that the reactions of individuals, who were broadly representative of the United States working population, to hypothetical scenarios involving printed standard form contracts of adhesion were affected by moral and social norms, suggesting a propensity to blame others for not reading long standard form contracts and an overconfidence in their own ability and willingness to read terms).

### B.  Anecdotal Evidence

Anecdotal evidence suggests that even those individuals with heightened expertise, who would be knowledgeable about the ramifications of internet contracts of adhesion, do not read the terms.  *See*, *e.g.*, Debra Cassens Weiss, *Chief Justice Roberts Admits He Doesn't Read the Computer Fine Print*, ABA Journal (Oct. 20, 2010) ("Answering a student question, Roberts admitted he doesn't usually read the computer jargon that is a condition of accessing websites."), *available at* http://www.abajournal.com/news/article/chief_justice_roberts_admits_he_doesnt_read_the_computer_fine_print (last visited Apr. 6, 2015).

Comedian John Oliver, on his June 8, 2014 Home Box Office show, "Last Week Tonight with John Oliver," highlighted the underlying problem regarding electronic contracts of adhesion as follows:  "If Apple put the entire text of *Mein Kampf* in their user agreement, you'd still click agree."  *See* Caroline Moss, "John Oliver Hilariously Explains the Dire Importance of Net Neutrality in a Way That Makes Sense," Business Insider (June 8, 2014), *available at* http://www.businessinsider.com/john-oliver-explains-net-neutrality-2014-6 (last visited Apr. 6, 2015).

### C.  The Reasonable Communicativeness Test

The ability to formulate a reliable description of how the average internet user would have interacted with the "terms of use" in this case is limited.  Available are the outdated fundamentals associated with the "reasonable communicativeness test" adopted by courts in the

1950s and 1960s.  They were then reflecting on how to assess the validity and enforceability of

contracts produced through vending machines, and their bearing on the doctrine of inquiry

notice.  Their conclusions were:

> (1) The burden is on the offeror to impress upon the offeree the
>
>     importance of the binding contract being entered into by the
>
>     latter; and
>
> (2) The duty is on the offeror to explain the relevance of the
>
>     critical terms governing the offeree's substantive rights
>
>     contained in the contract.

*See, e.g.*, *Steven v. Fidelity & Cas. Co. of N.Y.*, 377 P.2d 284, 294–95 (Cal. 1962) (holding that

under standardized contract purchased from vending machine by airline passenger, passenger

could reasonably have expected coverage for whole trip, including reasonable substituted

transportation necessitated by emergency, and insurer should have plainly and clearly brought to

passenger's attention such limitation of liability if insurer did not propose such coverage); *Lachs*

*v. Fidelity & Cas. Co. of N.Y.*, 118 N.E.2d 555, 558–59 (N.Y. 1954) (finding that burden was on

insurer to establish that words and expressions used in airline trip insurance policy, which

allegedly limited coverage to *scheduled* airlines, not only were susceptible of construction that

would limit coverage to scheduled airlines only, but that it was the only construction which could

fairly be placed on them); *see also Specht v. Netscape*, 306 F.3d 17, 30–32, 35 (2d Cir. 2002)

(applying reasonable communicativeness test to internet browsewrap contract); Juliet M.

Moringiello, *Signals, Assent, and Internet Contracting*, 57 Rutgers L. Rev. 1307, 1334–40

(2005) (recounting history of individuals contracting via machine and the adoption of the

"reasonable communicativeness test" by courts).

It is not unreasonable to assume that there is a difference between paper and electronic contracting.  Based on assumptions about internet consumers, they require clearer notice than do traditional retail buyers.  In the absence of contrary proof, it can be assumed that the burden should be on the offeror to impress upon the offeree—*i.e.*, the average internet user—the importance of the details of the binding contract being entered into.

The burden should include the duty to explain the relevance of the critical terms governing the offeree's substantive rights contained in the contract.  *See generally* Nancy S. Kim, *Wrap Contracts: Foundations and Ramifications* 211 (2013) ("Courts justify wrap contracts by claiming that the nondrafting party manifested consent, but their construction of what constitutes manifestation of consent has wandered too far from the truth."); *see also Specht*, 306 F.3d at 31–32, 35 ("We are not persuaded that a reasonably prudent offeree in these circumstances would have known of the existence of [the company's] terms.  Plaintiffs were responding to an offer [on the internet] that did not carry an immediately visible notice of the existence of license terms or require unambiguous manifestation of assent to those terms. . . . We conclude that in circumstances such as these . . . a reference to the existence of [] terms on a submerged screen is not sufficient to place consumers on inquiry or constructive notice of those terms. . . .  Reasonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers are essential if electronic bargaining is to have integrity and credibility.").

The offeror has thought through the problems with the aid of lawyers and other experts and is a "repeat player."  *See* Marc Galanter, *Why the "Haves" Come out Ahead: Speculations on the Limits of Legal Change*, 9 L. & Soc'y Rev. 95, 97–104 (1974) (arguing that litigants who are "repeat players" as opposed to "one-shotters" shape the development of the law by playing

for favorable rules—settling cases likely to produce adverse precedent and litigating cases likely to produce rules that promote their interests).  The consumer is usually a transient user, a "myopic" "one-shotter" experiencing "behavioral lock-in."  *See* Oren Bar-Gill, *Seduction by Contracts: Law, Economics and Psychology in Consumer Markets* 21–22 (2012) ("Myopic consumers care more about the present and not enough about the future. . . .  Myopia is common. People are impatient, preferring immediate benefits even at the expense of future costs."); William Barnes, Myles Gartland and Martin Stack, *Old Habits Die Hard: Path Dependency and Behavioral Lock-In*, 38 J. of Econ. Issues 371–77 (June 2004) (explaining that behavioral lock-in "occurs when the behavior of the agent (consumer or producer) is 'stuck' in some sort of inefficiency or sub-optimality due to habit, organizational learning, or culture").

## V.   CONTRACT FORMATION AND ASSENT

A substantial number of court opinions in recent years assume the validity of provisions contained in online contracts of adhesion.  The starting point of analysis must be the method through which an electronic contract of adhesion is formed.  The inquiry does not begin, as defendants argue, with the content of the provisions themselves.

### A.  Legal Research and Scholarship

Sometimes forgotten in the Internet Age—where contracts of adhesion are often the rule for online consumers—is the essential element of contract formation:  mutual manifestation of assent.  *See* Mark A. Lemley, *Terms of Use*, 91 Minn. L. Rev. 459, 459–60 (2006) (noting how courts are moving away from the principle that affirmative evidence of agreement is necessary to find a contract binding); *cf.* Ty Tasker and Daryn Pakcyk, *Cyber Surfing on the High Seas of Legalese: Law and Technology of Internet Agreements*, 18 Alb. L.J. Sci. & Tech. 79, 100 (2008) ("A user's assent may . . . be debatable where terms of use expressly state that acceptance occurs by 'clicking' on a button (as is typical), but instead the user presses the 'enter' key."); Christina

L. Kunz, *et al.*, *Browse-Wrap Agreements: Validity of Implied Assent in Electronic Form Agreements*, 59 Bus. Law. 279, 309 (2003) ("Because of the inherent ambiguity in acceptance by conduct, acceptance [of an internet contract] sometimes will not be valid because the user performed the conduct without intending to accept contract terms or without realizing he or she was accepting contractual terms.  If the user's assent was truly by mistake, the common law defense of unilateral mistake or mistake in transmission may be available . . . .").

Fading into the background are the "battle of the forms" debates of the late twentieth century, challenging the use of "boilerplate" contract terms by powerful corporations.  *See generally* U.C.C. § 2-207; Douglas G. Baird and Robert Weisberg, *Rules, Standards, and the Battle of the Forms: A Reassessment of 2-207*, 68 Va. L. Rev. 1217 (1982).

### 1.  "Informed Minority" Hypothesis

Lauded by many law and economic experts is the "informed minority" hypothesis, which presumes that, in competitive markets, "a minority of term-conscious buyers is sufficient to discipline sellers from using unfavorable boilerplate terms."  Yannis Bakos, Florencia Marotta-Wurgler and David R. Trossen, *Does Anyone Read the Fine Print? Consumer Attention to Standard Form Contracts*, 43 J. Legal Stud. 1, 1 (2014).  *See also*, *e.g.*, Robert A. Hillman and Jeffrey J. Rachlinsky, *Standard Form Contracting in the Electronic Age*, 77 N.Y.U. L. Rev. 429, 441–45 (2002) (describing pros and cons of the "informed minority" hypothesis).

Recent empirical studies analyzing the internet browsing behavior of consumers cast significant doubt on the applicability of the "informed minority" assumption to online shoppers. *See* Bakos *et al.*, 43 J. Legal Stud. at 32 (finding that between 0.05% and 0.22% of online shoppers access online agreements); *see also* James Gibson, *Vertical Boilerplate*, 70 Wash. & Lee L. Rev. 161, 170–80 (2013) (questioning the assumption of the "informed minority" hypothesis that presupposes consumers evaluate standard form contract terms).

31

## 2.   American Bar Association Working Group

In 2003, the American Bar Association ("ABA") Joint Working Group on Electronic

Contracting Practices ("Electronic Contracting Working Group of the ABA"), comprised of

members from within the Electronic Commerce Subcommittee of the Cyberspace Law

Committee and the Uniform Commercial Code Committee of the Business Law Section of the

ABA, laid out recommendations regarding what constitutes adequate notice in the electronic

contracting context.  *See* Kunz, *et al.*, 59 Bus. Law. at 279 (summarizing findings of the

Electronic Contracting Group of the ABA).  It wrote:

> In an electronic setting, the user can be given adequate notice of
> the existence of terms by a scroll box revealing a portion of the
> terms or by a well placed phrase or sentence in a format calculated
> to be apparent to the typical user of that Web site. . . .  [W]e
> suggest that care be taken to make sure that any linking capability
> of the phrase or sentence is clear to the reasonable user.
> . . .
>
> [C]lear language in a hyperlink that the terms constitute a proposed
> agreement is more likely to result in a binding contract.  For
> example, a hyperlink that makes the statement, "Use of this Web
> site is subject to our terms of use, click here to read," is more
> informative than a hyperlink that states simply, "Terms of Use."
> Even more informative would be a hyperlink that states the
> following:  "By going beyond this page, you are deemed to have
> agreed to our terms of use."

*Id*. at 291, 293–94.  The Electronic Contracting Working Group of the ABA suggested that a

user should only be considered to have "validly and reliably" assented to the terms of an

electronic agreement if the following four conditions are met:

> (1)   The user is provided with adequate notice of the existence of
> the proposed terms.
>
> (2)   The user has a meaningful opportunity to review the terms.
>
> (3)   The user is provided with adequate notice that taking a
> specified action manifests assent to the terms.
>
> (4)   The user takes the action specified in the latter notice.

*Id.* at 281.  Over a decade has passed since these recommendations were made.  "Unfortunately, many courts have not followed [them] and have instead[] swapped the signpost for the information, disregarding that notice requires both attracting user attention *and* providing at least some of the relevant information."  Kim, *Wrap Contracts*, at 132 (emphasis in original).

### 3.  Traditional Contract Doctrine and the Internet Age

Consumers spent over $300 billion in online purchases in 2014.  *See* Allison Enright, *U.S. Annual E-retail Sales Surpass $300 Billion for the First Time*, internetRETAILER (February 17, 2015), *available at* https://www.internetretailer.com/2015/02/17/us-annual-e-retail-sales-surpass-300-billion-first-ti (last visited Apr. 6, 2015).  "Most Americans now do some business over the Internet—whether making purchases or participating in a community at the pleasure of a forum host.  When we do, we are almost always presented (clearly or opaquely) with contractual terms governing our use of the site."  Jessica L. Hubley, *How Concepcion Killed the Privacy Class Action*, 28 Santa Clara Computer & High Tech. L.J. 743, 749 (2012).  The studies conducted to date and their implications reinforce the need to reconsider principles underlying contract law, developed in an age of paper and orality.

Nancy S. Kim, in her treatise *Wrap Contracts: Foundations and Ramifications*, "summarizes the [ten] doctrinal rules that are unique to internet-based wrap contracts, by comparing each rule to its traditional doctrine counterpart":

> **1.   Wrap doctrine**:  The assent of the nondrafting party is demonstrated by "notice" of legal terms and "manifestation of consent."   The offeree may receive notice after undertaking the acts that constitute acceptance. Manifestation of consent may mean that the adhering party has accepted by acting in a way that does not clearly indicate intent to accept the terms.

**Traditional contract doctrine**:  Reasonable notice must be given prior to the acts constituting acceptance.  The conduct of a party is not effective as a manifestation of consent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents.

2.    **Wrap doctrine**:  Manifestation of consent can mean the adhering party has not actively rejected the terms.

**Traditional contract doctrine**:  Silence generally does not constitute acceptance.  The offeror cannot require the offeree to actively reject unless otherwise agreed by the parties.

3.    **Wrap doctrine**:  Manifestation of consent may mean that the adherent was in the process of undertaking an action, such as viewing content on a website or purchasing a product on a website, when the terms presented an impediment which the adhering party then removed.   The terms may also be imposed without impediment while the adhering party is engaged in an activity, so that the activity continues in a seamless manner.

**Traditional contract doctrine**:  Luring users to an activity (such as advertising a big sale at a store) and then imposing a contract after the user has commenced an activity in an unobtrusive (*i.e.*, "sneaky") manner could be viewed as a "bait and- switch" tactic.  Traditional contract law recognizes fraud, unilateral mistake, and unconscionability as contract defenses to bait-and-switch tactics.  Section 5 of the Federal Trade Commission Act prohibits unfair and deceptive trade practices, and state legislation also prohibits bait-and-switch tactics.

4.    **Wrap doctrine**:  Notice means that some terms were visible that indicated legal terms applied to the activity that was being undertaken by the adhering party.   Notice does not mean that the legal terms themselves were visible.

**Traditional contract doctrine**:  Contract wording must be conspicuous.

5. **Wrap doctrine**:  Where a party has the power of acceptance, contract is not formed by acceptance but can be later modified and integrated by reference to other agreements.

   **Traditional contract doctrine**:  Where a party has the power of acceptance, act of acceptance triggers contract formation. Modifications and addendums to contract require new consideration.

6. **Wrap doctrine**:   Constructive notice is effective to incorporate other documents by reference.

   **Traditional contract doctrine**:   In order to incorporate another document by reference into an agreement, the agreement must clearly evidence intent that the document be made a part of the agreement.

7. **Wrap doctrine**:  The terms of an offer can be indefinite and modified at will.

   **Traditional contract doctrine**:  Offer and acceptance must express a present intent to enter into a contract and terms of an offer must be definite.

8. **Wrap doctrine**:  The nondrafting party bears the burden of [showing] contracting ambiguities and opaqueness.

   **Traditional contract doctrine**:  Contract ambiguities and opaqueness are construed against the drafting party.

9. **Wrap doctrine**:   Every contract should be analyzed as though it were a negotiated paper agreement that is signed by both parties.

   **Traditional contract doctrine**:   Special rules apply to certain standard form contracts, such as airline tickets or insurance contracts.   The "reasonable communicativeness"

test considers both the physical characteristics of the contract and extrinsic factors, such as the contracting environment.

10. **Wrap doctrine**:  A reasonable prudent offeree is one that is uniquely diligent, overly cautious, highly knowledgeable about wrap contract doctrine, exceptional at multitasking, infinitely patient, and likely does not exist in the real world.

   **Traditional contract doctrine**:  A reasonable offeree is judged based upon the standard of an ordinary person standing in the shoes of the offeree.

Kim, *Wrap Contracts*, at 109–11.

"While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract."  *Register.com, Inc. v. Verio*, 356 F.3d 393, 403 (2d Cir. 2004); *see also*, *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (same); *Teiber & Straub, Inc. v. U.P.S.*, 474 F.3d 379, 385 (7th Cir. 2007) (same). "[G]iven the expansive and open nature of the World Wide Web, providers should not be permitted to enforce overreaching terms in court by stating relatively hidden provisions purporting to expose average users or consumers to . . . unexpectedly oppressive obligations." Tasker and Pakcyk, 18 Alb. L.J. Sci. & Tech. at 148; *see also supra* Part IV.

Experts in commercial practice have recommended as best practices for businesses that they ensure internet users have a realistic opportunity to read the "terms of use" on a business's website.  *See, e.g.*, Allison S. Brehm and Cathy D. Lee, *"Click Here to Accept the Terms of Service,"* 31-WTR Comm. Law. 4, 6–7 (2015).  Designing a website so that the user must scroll through the "terms of use" *and* click "accept" in order to complete an internet transaction is one such good practice.  *Id.* at 6.

For ease of reference, and to create a necessary distinction from clickwrap agreements, the instant memorandum refers to such contracts as "scrollwraps."  *Cf. Hancock v. Am. Tel. &*

36

*Tel. Co.*, 701 F.3d 1248, 1257–58 (10th Cir. 2012) (holding internet agreement valid under

Florida and Oklahoma law where process gave customer opportunity to *review internet terms in*

*scrolling text box*; customer had to click an "I Agree" button to manifest assent to internet terms

in order to continue with registration process and activation of internet service).  As indicated

below, Google Analytics, for example, uses scrollwraps.



Google Analytics, *available at* http://www.google.com/analytics (last visited Apr. 6, 2015)

("Google Analytics Scrollwrap Agreement") (pop-window with terms accessed by clicking

button marked "Access Google Analytics" from homepage, clicking button on next page marked

"Sign up," then filling information into form on next page and clicking button at bottom marked

"Get Tracking ID").

### B.  Law

#### 1.  Choice of Law

Determining the validity and enforceability of a contract is an issue of substantive state law.  *See*, *e.g.*, *Specht*, 306 F.3d at 27 ("[I]n deciding whether parties agreed to arbitrate a certain matter, a court should generally apply state-law principles to the issue of contract formation."); *see also Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987) ("[S]tate law, whether of legislative or judicial origin, is applicable [to the determination of whether the parties agreed to arbitrate] if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally."); *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) (holding that in federal courts, except in matters governed by the Federal Constitution or by acts of Congress, substantive law to be applied is law of the state).

Relying on a contractual provision before a contract has been found to have been accepted by the parties as binding is unacceptable.  "Applying the choice-of-law clause to resolve the contract formation issue would presume the applicability of a provision before its adoption by the parties has been established."  *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119, 126–27 (2d Cir. 2012).  *See also*, *e.g.*, *Trans–Tec Asia v. M/V Harmony Container*, 518 F.3d 1120, 1124 (9th Cir. 2008) ("[W]e cannot rely on the choice of law provision until we have decided, as a matter of law, that such a provision was a valid contractual term and was legitimately incorporated into the parties' contract."); *Van Tassell v. United Mktg. Grp., LLC*, 795 F. Supp. 2d 770, 787–88 (N.D. Ill. 2011) ("The Court agrees that Defendants have put the cart before the horse in arguing that the scope of the arbitration agreement encompasses Plaintiffs' claims before establishing the existence or validity of any agreement.").

In the instant case, the substantive contractual laws of New York, California, and Illinois are at issue.  These states laws are substantively similar with respect to the issue of contract formation.  *See infra* Part V.B.2.

### 2.  Common Law Contracting

### a.  Acceptance

"Mutual manifestation of assent" is the "touchstone" of a binding contract.  *Specht*, 306 F.3d at 29 (citations omitted) (applying New York and Utah law in denying enforcement of arbitration clause where software user was not given sufficient notice of terms of agreement).  A "transaction," even if created online, "in order to be a contract, requires a manifestation of agreement between the parties" as to its terms.  *Id.* at 28 (citations omitted).

Where the terms of the contract are offered by one party to another, unequivocal acceptance of the terms by the receiving party is required.  "As a general principle, at common law[,] an acceptance [of a contract], in order to be effective, must be positive and unambiguous."  2 Williston on Contracts § 6:10 (4th ed.).

> [C]onduct manifesting [acceptance] may be words or silence, action or inaction, but the conduct of a party is not effective as a manifestation of his [acceptance] unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he [accepts].

*Schnabel*, 697 F.3d at 120 (internal quotation marks and citations omitted).  *See also*, 22 N.Y. Jur. 2d Contracts § 46 (2015) (sufficiency of acceptance of offer under New York law); 14 Cal. Jur. 3d Contracts § 82 (2015) (same under California law); 12 Ill. Law and Prac. Contracts § 25 (2015) (same under Illinois law).

### b.  Adhesion Contracts

In the modern commercial world, there are reasons to allow parties to contract without the consideration or negotiation of every term.  *Schnabel*, 697 F.3d at 124 (holding that where

purported assent to a contract is largely passive, the contract-formation question will often turn on whether a reasonably prudent offeree would be on notice of the terms at issue).  A contract on a printed standardized form that is offered on a take-it or leave-it basis—usually by a merchant that monopolizes a particular market, or whose bargaining power significantly outweighs that of the consumer—is a contract of adhesion.  Such a contract exists where a party of superior bargaining strength, *e.g.*, a vendor, provides a subscribing party only with the opportunity to adhere to the contract or forfeit use, ownership or access to the vendor's services and goods.  But, the assumption is that the parties have a reasonable opportunity to examine terms before adhering.  The term "contract of adhesion" in the American legal lexicon is credited to Edwin Patterson.  *See* Donald P. Harris, *Trips and Treaties of Adhesion Part II: Back to the Past or A Small Step Forward?*, 2007 Mich. St. L. Rev. 185, 195 n.39 (2007) (explaining that it was Edwin Patterson that suggested that the adhesion doctrine "'seem[ed] worthy of a place in our legal vocabulary'") (citing Edwin W. Patterson, *The Interpretation and Construction of Contracts*, 64 Colum. L. Rev. 833, 856 (1964) (tracing the origins of the adhesion doctrine from the early twentieth century)).

Often overlooked in our electronic age is the principle undergirding the validity of contracts of adhesion—knowledge by parties of terms.  This principal can be traced to traditional face-to-face consumer bargaining.  "Cashiers cannot be expected to read legal documents to customers before ringing up sales."  *Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1149 (7th Cir. 1997) (arbitration clause binding where terms were included in box with product purchased over the phone and consumer did not return the product within thirty days as required by the terms). The practicalities of the situation need not be ignored.

"As a general principle, an offeree cannot actually assent to an offer unless the offeree knows of its existence." *Schnabel*, 697 F.3d at 121 (citation omitted). "An offer—and all of its terms—[must] ordinarily precede acceptance." *Id.*

Valid contracts of adhesion typically meet seven conditions:

(1) The document whose legal validity is at issue is a printed form that contains many terms and clearly purports to be a contract.

(2) The form has been drafted by, or on behalf of, one party to the transaction.

(3) The drafting party participates in numerous transactions of the type represented by the form and enters into these transactions as a matter of routine.

(4) The form is presented to the adhering party with the representation that, except perhaps for a few identified items (such as the price term), the drafting party will enter into the transaction only on the terms contained in the document. This representation may be explicit or may be implicit in the situation, but it is understood by the adherent.

(5) After the parties have dickered over whatever terms are open to bargaining, the document is signed by the adherent.

(6) The adhering party enters into few transactions of the type represented by the form—few, at least, in comparison with the drafting party.

(7) The principal obligation of the adhering party in the transaction considered as a whole is the payment of money.

Todd D. Rakoff, *Contracts of Adhesion: An Essay in Reconstruction*, 96 Harv. L. Rev. 1173, 1177 (1983).

Terms in contracts of adhesion are subject to a reasonableness standard. *See Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 595 (1991) ("forum-selection clauses contained in form . . . contracts are subject to judicial scrutiny for fundamental fairness"). In *Carnival Cruise*, the Supreme Court held that a forum selection clause printed on a cruise ticket was valid and

41

enforceable.  *Id.* at 594.  Plaintiffs had purchased cruise tickets through a travel agent.  *Id.* at 587.

When the tickets arrived in the mail, on the front of them, in bold font, appeared the following:

"SUBJECT TO CONDITIONS OF CONTRACT ON LAST PAGES IMPORTANT! PLEASE

READ CONTRACT ON LAST PAGES 1, 2, 3."  *Id.*; *see also id.* at 605 (image reproduced

below and key terms circled in red for emphasis).



The plaintiff slipped and fell on a cruise ship while it was off the coast of Mexico.  *Id.* at

588.  A suit was filed in the United States District Court for the Western District of Washington.

*Id.*  Negligence on the part of the cruise line and its employees was alleged.  *Id.*  Defendant

moved to transfer venue to Florida in accordance with the forum selection clause; it appeared on

the first page of the contract.  *Id.* at 587–88.  The district court granted the motion, holding that

the cruise line did not have enough contacts with the State of Washington to establish personal

jurisdiction.  *Id.* at 588.  The Court of Appeals for the Ninth Circuit reversed, holding that the

cruise line had enough contacts with Washington State to justify jurisdiction.  *Id.* at 588–89.  It

42

held that the forum selection clause was unenforceable since it had not been "freely bargained for." *Id.* at 589.

The Supreme Court reversed, holding that the lack of negotiation leading to the contract did not render the forum selection clause unenforceable. *Id.* at 593. The Court explained that it would be unreasonable to expect consumers to negotiate venue terms in "an ordinary cruise ticket." *Id.* It found sound business and economic reasons for enforcing forum selection clauses in cruise contracts, such as keeping litigants from wasting both their time and the court's time in determining the appropriate forum for the suit. *Id.* at 593–94. As it emphasized, such clauses should be analyzed for fairness:

> In this case, there is no indication that petitioner set Florida as the forum in which disputes were to be resolved as a means of discouraging cruise passengers from pursuing legitimate claims. Any suggestion of such a bad-faith motive is belied by two facts: [Defendant] has its principal place of business in Florida, and many of its cruises depart from and return to Florida ports. Similarly, there is no evidence that [defendant] obtained respondents' accession to the forum clause by fraud or overreaching. Finally, *respondents have conceded that they were given notice of the forum provision* and, therefore, presumably retained the option of rejecting the contract with impunity. In the case before us, therefore, we conclude that the Court of Appeals erred in refusing to enforce the forum-selection clause.

*Id.* at 593–95 (emphasis added).

### c. Unconscionability

Courts do not enforce terms of agreements that are unconscionable. *See* 22 N.Y. Jur. 2d Contracts § 2 (2015); 14 Cal. Jur. 3d Contracts § 11 (2015); 12A Ill. Law and Prac. Contracts § 150 (2015). It is recognized that where the offering party has reason to believe "that the party manifesting assent" to a contract "would not do so" if she "knew that the writing contained a particular term, the term is not part of the agreement." Restatement (Second) of Contracts

43

§ 211(3) (1981).  *See also cf. Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63

(1995) ("As a practical matter, it seems unlikely that petitioners . . . had any idea that by signing

a standard-form agreement to arbitrate disputes they might be giving up an important substantive

right.  In the face of such doubt, we are unwilling to impute this intent to petitioners.")

To characterize a term as unconscionable "requires a showing that the contract was both

procedurally and substantively unconscionable when made—*i.e.*, some showing of an absence of

meaningful choice on the part of one of the parties together with contract terms which are

unreasonably favorable to the other party."  *Gillman v. Chase Manhattan Bank, N.A.*, 534 N.E.2d

824, 828 (N.Y. 1988) (internal quotation marks and citations omitted); 8 Williston on Contracts

§ 18:9 (4th ed. 2014) (same).  As noted below, courts evaluate procedural and substantive

unconscionability on a "sliding scale."  *See generally* Howard O. Hunter, Modern Law of

Contracts § 19:41 (2015 ed.) (discussing the difference between procedural and substantive

unconscionability).

### i.  Procedural

Whether procedural unconscionability exists is determined by what led to the formation

of the contract.

> Procedural unconscionability involves questions about the manner
> in which the agreement was reached:  Did one party adequately
> explain the content of the agreement to the other?  Was the
> explanation in a language readily understood by the other party?
> Were there sharp practices or overreaching?  Did one party take
> advantage of the other's lack of experience or naïveté?

*Id.*  "Procedural unconscionability is broadly conceived to encompass not only the employment

of sharp practices and the use of fine print and convoluted language, but a lack of understanding

and an inequality of bargaining power."  *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 249 (1995)

(O'Connor, J., concurring in part and dissenting in part).  *See also, e.g.*, *Ting v. AT&T*, 319 F.3d

1126, 1149 (9th Cir. 2003) (applying California law and finding that agreement, which contained arbitration provision, was procedurally unconscionable when it imposed terms on a "take-it-or-leave-it basis" to consumers and the envelope the agreement was delivered in did not make it readily evident that it contained a contract).

### ii.  Substantive

Substantive unconscionability is essentially an issue of the reasonableness of a term. "Substantive unconscionability involves questions about the fundamental fairness of the agreement or clauses within the agreement:  Regardless of the identity of the parties, is this a clause or a contract that should be enforced by a court?"  Modern Law of Contracts § 19:41.

Contractual terms will only be held unconscionable where the facts show substantive unconscionability; procedural unconscionability alone may not render a contract unreasonable on its face.  *See Brower v. Gateway 2000, Inc.*, 676 N.Y.S.2d 569, 573–74 (N.Y. App. Div. 1st Dep't 1998) (arbitration term unenforceable where procedural unconscionability is not present but substantive unconscionability is apparent due to requirement that all claims must be arbitrated in Chicago according to the rules and procedures promulgated by the International Chamber of Commerce, which is located in France); *see also Trompeter v. Ally Financial, Inc.*, 914 F. Supp. 2d 1067,1073–76 (N.D. Cal. 2012) (arbitration clause unenforceable under California law where minimal procedural unconscionability is present—"based on the adhesive nature of the form arbitration agreement and the lack of opportunity . . . to negotiate its terms"— and substantive unconscionability is apparent due to arbitration requirement that leaves parties unequal in their ability to pursue their respective claims); *Bragg v. Linden Research, Inc.*, 487 F. Supp. 2d 593, 611 (E.D. Pa. 2007) (finding that "'because the unilateral modification clause renders the arbitration provision severely one-sided in the substantive dimension, even moderate procedural unconscionability renders the arbitration agreement unenforceable'" (citation

omitted)); *Kinkel v. Cingular Wireless*, 857 N.E.2d 250, 264, 274–75 (Ill. 2006) (class action

waiver unenforceable where some procedural unconscionability is present and substantive

unconscionability is apparent due to arbitration requirement that would have burdened plaintiffs'

individual claims).

### d.  Material Terms and Material Alterations

"In order to be enforceable, a contract must be sufficiently definite as to its 'material

terms,' which include, *e.g.*, subject matter, price, payment terms, quantity, duration,

compensation, and the dates of delivery and production, so that the promises and performance to

be rendered by each party are reasonably certain."  17A Am. Jur. 2d *Contracts* § 190 (2015).  *See*

*also*, *e.g.*, *Allied-Bruce Terminix Companies, Inc. v. Dobson*, 513 U.S. 265, 281 (1995)

(considering price, service, credit, and arbitration clauses material terms in a contract).  A

"material term" in a contract is "[a] contractual provision dealing with a significant legal issue

such as subject matter, price, payment, quantity, quality, duration, or the work to be done."

Black's Law Dictionary 1608 (9th ed. 2009); *see also*, *e.g.*, *Local 917, Intern. Broth. of*

*Teamsters v. N.L.R.B.*, 577 F.3d 70, 74 (2d Cir. 2009) (material terms include, but are not limited

to, "price, quantity, and the means by which the product is delivered" (citations omitted)).

Arbitration, which often involves forgoing the right to become a member of a class

action, is a significant legal issue that the Supreme Court has equated to other materials terms in

a contract.  *See Allied-Bruce Terminix Companies, Inc.*, 513 U.S. at 281 ("What States may not

do is decide that a contract is fair enough to enforce all its basic terms (price, service, credit), but

not fair enough to enforce its arbitration clause.")  *See also cf.* Consumer Financial Protection

Bureau, *Arbitration Study: Report to Congress, pursuant to Dodd-Frank Wall Street Reform and*

*Consumer Protection Act § 1028(a)*, § 10 at 5–6 (March 2015) (finding that arbitration clauses

used by companies to avoid lawsuits take away consumers' rights to sue in court and offer little, if any, benefit to consumers), *available at* http://files.consumerfinance.gov/f/201503_ cfpb_arbitration-study-report-to-congress-2015.pdf. (last visited Apr. 6, 2015).

A forum selection clause in an electronic contract of adhesion is a material term.  A "material alteration" to a contract is "an addition to an incomplete [contract] resulting in the modification of a party's obligations."  Black's Law Dictionary 91.  "A material alteration is one that would result in *surprise* or *hardship* if incorporated without express awareness by the other party."  *Bayway Refining Co. v. Oxygenated Mktg. and Trading A.G.*, 215 F.3d 219, 224 (2d Cir. 2000) (emphasis in original) (internal quotation marks and citation omitted) (applying New York law).  *See also Shany Co., Ltd. v. Crain Walnut Shelling, Inc.*, No. 11-CV-1112, 2012 WL 1979244, at *6 (E.D. Cal. June 1, 2012) ("In California, as in New York, a material alteration is one that would result in surprise or hardship if incorporated without express awareness by the other party." (internal quotation marks and citation omitted)); *Jada Toys, Inc. v. Chicago Imp., Inc.*, No. 07-CV-699, 2009 WL 3055370, at *8 (N.D. Ill. Sept. 18, 2009) ("In Illinois, the test for whether an additional term would be a material alteration to the contract is 'whether the addition constitutes an unreasonable surprise to one of the bargaining parties.'" (citation omitted)).

"[A]uthority indicates that a proposal to add a forum selection clause to the terms of an already existing agreement amounts to a proposal to materially alter that agreement."  *Hardwire, LLC v. Zero Int'l, Inc.*, No. 14-CV-54, 2014 WL 5144610, at *8 n.8 (D. Del. Oct. 14, 2014) (collecting cases).  *See also*, *e.g.*, *Trans–Tec Asia v. M/V Harmony Container*, 435 F.Supp.2d 1015, 1025 (C.D. Cal. 2005) ("[C]ourts have generally found forum-selection clauses to be material alterations." (collecting cases)), *aff'd*, 518 F.3d 1120 (9th Cir. 2008); *Daisey Indus., Inc. v. K–Mart Corp.*, No. 96-CV-4211, 1997 WL 642553, at *3–4 (S.D.N.Y. Oct.17, 1997) (finding

47

that forum selection clause must be specifically consented to). *But see, e.g.*, *Vitricon, Inc. v. Midwest Elastomers, Inc.*, 148 F. Supp. 2d 245, 248 (E.D.N.Y. 2001) ("Courts have consistently rejected the argument that forum selection clauses contained in pre-printed contracts are unenforceable." (citation omitted)).

### e.  Notice

Where the assent to terms of a contract is "largely passive," as is often the case with electronic contracts of adhesion, *see infra* Part V.B.3, "the contract-formation question will often turn on whether a reasonably prudent offeree would be on [inquiry] notice of the term[s] at issue." *Schnabel*, 697 F.3d at 120, 126–27 (holding that under contract law of Connecticut or California, consumers were not put on inquiry notice of arbitration provision for online discounts program through transmission of terms by e-mail after initial enrollment and did not assent to arbitration clause by failing to cancel their memberships after expiration of free-trial period).  In making a determination about whether a prudent offeree was on inquiry notice of the terms of a contract, the "[c]larity and conspicuousness of [the] terms are important. . . ." *Specht*, 306 F.3d at 30 (applying California law).  *See also Nat'l Family Ins. Co. v. Exch. Nat. Bank of Chicago*, 474 F.2d 237, 242 n.1 (7th Cir. 1973) ("I have categorized by the term 'constructive notice' factual situations in which there is a lack of actual notice but there is that which in the law is equated with actual notice.  This is variously termed 'implied notice,' 'constructive notice,' 'presumptive or imputed notice.'  The Ninth Circuit expressed the thought that constructive notice includes 'implied notice' and 'inquiry notice,' the latter apparently being similar to or identical with 'implied notice.'" (citations omitted)).

Where there is no actual notice of contractual terms, "an offeree is still bound by the provision[s] if he or she is on *inquiry* notice of the term[s] and assents to [them] through the

conduct that a reasonable person would understand to constitute assent." *Schnabel*, 697 F.3d at

120 (emphasis in original). "Inquiry notice is actual notice of circumstances sufficient to put a

prudent man upon inquiry." *Specht*, 306 F.3d. at 30 n.14 (internal quotation marks and citation

omitted); *PNC Bank, Nat. Ass'n v. Nordwall*, 499 B.R. 599, 607 (C.D. Ill. 2013) ("Inquiry notice

charges a purchaser [in Illinois] with knowledge of facts that he 'might have discovered by

diligent inquiry.'" (quoting *Miller v. Bullington*, 381 Ill. 238, 241 (1942))).

> The Court of Appeals for the Second Circuit observed:
>
> > While "it is true that a party cannot avoid the terms of a contract on
> > the ground that he or she failed to read it before signing, an
> > exception to this general rule exists when the writing does not
> > appear to be a contract and the terms are not called to the attention
> > of the recipient.  In such a case no contract is formed with respect
> > to the undisclosed term[s]."

*Hirsch v. Citibank, N.A.*, 542 F. App'x 35, 37 (2d Cir. 2013) (quoting *Specht*, 306 F.3d at 30)

(applying New York law and finding that there was a triable issue as to whether signature cards

sufficiently referenced a document containing an arbitration provision and whether holders

obtained benefits under client manual allegedly provided by bank).  *See also Hines v.*

*Overstock.com, Inc.*, 380 F. App'x 22, 25 (2d Cir. 2010) ("Here, according to [defendant's]

submission, users of the Overstock website 'accept' the Terms and Conditions merely by using

the website.  This assertion alone does not support a finding that a binding agreement existed,

however, because Overstock did not allege any facts tending to show that a user would have had

actual or constructive knowledge of the Terms and Conditions."); *Nguyen*, 763 F.3d at 1177

(applying California law in denying enforceability of arbitration clause in purported internet

agreement, writing:  "Whether a user has inquiry notice of a[n] [internet] agreement . . . depends

on the design and content of the website and the agreement's webpage." (citation omitted));

*Sgouros v. TransUnion Corp.*, No. 14-CV-1850, 2015 WL 507584, at *5–7 (N.D. Ill. Feb. 5,

2015) (applying Illinois law and finding internet agreement invalid because users were not provided with "sufficient constructive notice . . . that they were being bound by the [Website's] terms," which appeared at the top of the webpage amply far from other text requesting separate authorization), *appeal filed*, No. 15-1371 (7th Cir. Feb. 25, 2015).

### 3.   Electronic Adhesion Contracts

Before assessing the validity and enforceability of the contracts in the instant action by applying common law principles of contract formation and assent, it is necessary to turn to case law regarding electronic contracts of adhesion.  Four general types of online consumer contracts exist: (a) browsewrap; (b) clickwrap; (c) scrollwrap; and (d) sign-in-wrap.

As used in this memorandum, the following brief definitions apply:  *Browsewrap* exists where the online host dictates that assent is given merely by using the site.  *Clickwrap* refers to the assent process by which a user must click "I agree," but not necessarily view the contract to which she is assenting.  *Scrollwrap* requires users to physically scroll through an internet agreement and click on a separate "I agree" button in order to assent to the terms and conditions of the host website.  *Sign-in-wrap* couples assent to the terms of a website with signing up for use of the site's services; it is the form used by Gogo in the instant case.

### a.   Browsewrap

"Browsewraps can take various forms but basically the website will contain a notice that—by merely using the services of, obtaining information from, or initiating applications within the website—the user is agreeing to and is bound by the site's terms of service."  *United States v. Drew*, 259 F.R.D. 449, 462 n.22 (C.D. Cal. 2009).  Because of the passive nature of acceptance in browsewrap agreements, courts closely examine the factual circumstances surrounding a consumer's use.  "Despite their ubiquity, browsewrap agreements are still relatively new to courts."  *Be In, Inc. v. Google Inc.*, No. 12-CV-03373, 2013 WL 5568706, at *7

(N.D. Cal. Oct. 9, 2013).  For an internet browsewrap contract to be binding, consumers must have reasonable notice of a company's "terms of use" and exhibit "unambiguous assent" to those terms.  *Specht*, 306 F.3d at 35; *see also Be In*, 2013 WL 5568706, at *6–8 (collecting cases).

At issue in *Specht* was an arbitration clause contained in license terms on a website.  *Specht*, 306 F.3d at 20.  It was allegedly accepted when plaintiffs downloaded a plug-in (*i.e.*, software that supplements or enhances the capabilities of an existing program) from the site.  *Id.* at 23.  When plaintiffs downloaded free software from the site by the click of a button, they could not initially see a reference to license terms.  *Id.*  The sole reference to terms could have been seen by plaintiffs only if they had scrolled down to the bottom of the screen before commencing a download.  *Id.*

Defendants moved to compel arbitration and stay court proceedings.  The motion was denied by the district court.  *Id.* at 25.  Applying California law, the Court of Appeals for the Second Circuit affirmed, finding that plaintiffs were not put on sufficient notice of terms.  *Id.* at 32.  It noted that "there is no reason to assume that viewers will scroll down to subsequent screens simply because screens are there."  *Id.*

> [W]e conclude that under the circumstances here, plaintiffs' downloading of [the software] did not constitute acceptance of defendants' license terms.  *Reasonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers are essential if electronic bargaining is to have integrity and credibility.*  We hold that a reasonably prudent offeree in plaintiffs' position would not have known or learned, prior to acting on the invitation to download, of the reference to [the software's] license terms hidden below the "Download" button on the next screen.

*Id.* at 35 (emphasis added).

In *Hines*, the Court of Appeals for the Second Circuit was again faced with the issue of a browsewrap agreement between a consumer and an online retailer.  *Hines v. Overstock.com, Inc.*,

668 F. Supp. 2d 362, 365 (E.D.N.Y. 2009), *aff'd*, 380 F. App'x at 25.  The consumer purchased a vacuum cleaner from the retailer through its website.  *Id.* at 365.  Unsatisfied with her purchase, she returned it.  *Id*.  Upon receipt of the returned item, she was levied a $30 restocking fee.  *Id.* She sued.  *Id.*  Her claim was that she had been advised that she could return her purchase without any additional charges.  *Id.*  The defendant retailer moved to dismiss, or stay for arbitration, or, alternatively, transfer venue.  The motion was based on arbitration and forum selection clauses in the "terms and conditions" browsewrap notice.  *Id.*

Applying both New York and Utah law, the *Hines* court denied the defendant's motion. *Id.* at 366.  It found that the consumer had no notice of the "terms and conditions" on the retailer's website.  *Id.*  They therefore were not binding.  *Id.* at 367.  The court observed that the advisory phrase, "Entering this Site will constitute your acceptance of these Terms and Conditions," was located within the terms and conditions themselves, not in a prominent place that a user of the website would naturally come across.  *Id.*  "[Plaintiff] . . . lacked notice of the Terms and Conditions because the website did not prompt her to review [them] *and* because the link to [them] was not prominently displayed so as to provide reasonable notice of the Terms and Conditions."  *Id.* (emphasis added).  *Accord Nguyen*, 763 F.3d at 1177 ("Whether a user has inquiry notice of a browsewrap agreement . . . depends on the design and content of the website and the agreement's webpage." (citation omitted)) (denying enforceability of arbitration clause in website's browsewrap "terms of use"); *In re Zappos.com, Inc., Customer Data Breach Sec. Litig.*, 893 F.Supp.2d 1058, 1064–65 (D. Nev. 2012) (applying Nevada law and finding browsewrap agreement unenforceable where the hyperlink to "terms of use" is "inconspicuous, buried in the middle to bottom of every [defendant] webpage among many other links, and the website never directs a user to the Terms of Use"); *see also*, *Edme v. Internet Brands, Inc.*, 968

F. Supp. 2d 519, 525–26 (E.D.N.Y. 2013) (applying New York Law and finding that a forum selection clause was not binding where no evidence is presented that would show how a user is presented with the "terms of use" on the website); *Be In*, 2013 WL 5568706, at *8–9 (applying both New York and California law and dismissing without prejudice breach of contract claim where plaintiff makes no factual allegations that would show how a user is presented with the "terms of use" on the website); *Van Tassell*, 795 F. Supp. 2d at 789 ("[T]he Court denies Defendants' joint motion to compel arbitration without prejudice because there is a genuine issue of material fact pertaining to whether Plaintiffs ever viewed the enrollment web pages containing the Terms and Conditions upon which Defendants rely.").

Following the ruling in *Specht*, courts generally have enforced browsewrap terms only against knowledgeable accessors, such as corporations, not against individuals. *See, e.g.*, *Register*, 356 F.3d at 403 (applying California law in finding that defendant using automated programs to repeatedly access competitor's website was put on notice of "terms of use" that were sent to defendant each time after it accessed the website's data); *Ticketmaster Corp. v. Tickets.com, Inc.*, No. 99-CV-7654, 2003 WL 21406289, at *2 (C.D. Cal. March 7, 2003) (applying California law in finding binding contract where defendant company was put on reasonable notice of "terms of use" of competitor's website, plaintiff having "placed in a prominent place on the home page the warning that proceeding further binds the user to the conditions of use" and defendant accessed the site repeatedly). "An examination of the cases that have considered browsewraps in the last five years demonstrates that the courts have been willing to enforce terms of use against corporations, but *have not been willing to do so against individuals*." *Lemley*, 91 Minn. L. Rev. at 472 (emphasis added). *But see Hubbert v. Dell Corp.*, 835 N.E.2d 113, 121–122 (Ill. App. Ct. 5th Dist. 2005) (arbitration clause enforceable where

user was presented with hyperlink marked "Terms and Conditions of Sale" and the phrase "All sales are subject to [Defendant's] Term[s] and Conditions of Sale" appeared on multiple successive webpages), *appeal denied*, 844 N.E.2d 965 (Ill. 2006).

### b. Clickwrap

Clickwrap agreements necessitate an active role by the user of a website. Courts, in general, find them enforceable. *Drew*, 259 F.R.D. at 462 n.22. "Clickwrap agreements require a user to affirmatively click a box on the website acknowledging awareness of and agreement to the terms of service before he or she is allowed to proceed with further utilization of the website." *Id*. By requiring a physical manifestation of assent, a user is said to be put on inquiry notice of the terms assented to.

Courts of Appeals, while accepting the general definition of what constitutes a clickwrap agreement, have yet to rule on their presumptive validity. The term "clickwrap" only appears in seven reported Courts of Appeals decisions, none of which decide the *per se* enforceability of these agreements. *Nguyen*, 763 F.3d at 1179 (holding browsewrap agreement invalid); *Hancock*, 701 F.3d at 1257–58 (holding scrollwrap contract valid where customers were given opportunity to review internet terms in scrolling text box, and customer had to click an "I Agree" button to manifest assent to internet terms and to continue with registration process and activation of internet service); *Schnabel*, 697 F.3d at 129–30 ("The accessibility of the arbitration provision from a hyperlink on the enrollment screen, as appears to have been the case here, might have created a substantial question as to whether the provision was part of a contract between the parties, [but] [t]he issue is not before us."); *One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 266 (5th Cir. 2011) (assessing enforceability of an incorporation by reference in a hardcopy contract to online browsewrap terms and conditions); *A.V. ex rel. Vanderhye v.*

*iParadigms, LLC*, 562 F.3d 630, 645 n.8 (4th Cir. 2009) ("[W]e decline to address the question

of whether the terms of the Clickwrap Agreement created an enforceable contract between [the

parties].")); *Register.com*, 356 F.3d at 428 ("Despite some similarities, we nonetheless find the

arrangement in this case is easily distinguished from . . . 'clickwrap' and 'browsewrap[]'

licenses."); *Specht*, 306 F.3d at 23 (finding browsewrap agreement invalid).

By contrast, almost "[e]very [lower] court to consider the issue has found 'clickwrap'

licenses, in which an online user clicks 'I agree' to standard form terms, enforceable." *Lemley*,

91 Minn. L. Rev. at 459 (citations omitted). *See also*, *e.g.*, *Centrifugal Force, Inc. v. Softnet*

*Commc'n, Inc.*, No. 08-CV-5463, 2011 WL 744732, at *6–8 (S.D.N.Y. Mar. 1, 2011) (finding

binding clickwrap software license agreement); *Feldman v. Google, Inc.*, 513 F. Supp. 2d 229,

233 (E.D. Pa. 2007) (forum selection clause binding where online contract between internet

advertising service and would-be advertiser read in bold at top "Carefully read the following

terms and conditions," adding, "If you agree with these terms, indicate your assent below' and

user could only progress by clicking on box marked 'accept'" and "terms of use" were presented

to user in scrollable window); *Recursion Software, Inc. v. Interactive Intelligence, Inc.*, 425 F.

Supp. 2d 756, 782–84 (N.D. Tex. 2006) (finding clickwrap agreements valid and enforceable,

but denying summary judgment on breach of contract claim due to issues of material fact); *i.Lan*

*Systems, Inc. v. Netscout Serv. Level Corp.*, 183 F. Supp. 2d 328, 338–39 (D. Mass 2002)

(holding that a contract was formed when the buyer clicked on box stating "I Accept," even

though the buyer also attempted to bargain for other terms). *But see Sgouros*, 2015 WL 507584,

at *5–6 (applying Illinois law and finding clickwrap agreement not binding where website did

not make explicitly clear that button marked "I Accept" indicated assent to "terms of use"

presented in scrollable window at top of webpage, in between which was other text requesting separate authorization).

### c.  Scrollwrap

There is a crucial distinction between online agreements that a user must view because of the nature of the website's construction and design—*i.e.*, scrollwraps—and those that merely require a user to click an "I agree" box that appears next to a hyperlink containing "terms of use"—*i.e.*, clickwraps.  *See* Google Analytics Scrollwrap Agreement and 2011 Create Account Page (each reproduced below for ease of comparison).

*Scrollwrap*



*Clickwrap*

Some court decisions that use the term "clickwrap" are in fact dealing with "scrollwrap" agreements where an internet consumer had a realistic opportunity to review and scroll through

the electronic agreement.  *See, e.g.*, *Feldman*, 513 F. Supp. 2d at 236–38 (holding that the

plaintiff had the duty to read terms that were presented in a scroll box and required a click to

agree and, therefore, the fact that the entire contract was not visible in the scroll box was

irrelevant); *Bar-Ayal v. Time Warner Cable Inc.*, No. 03-CV-9905, 2006 WL 2990032, at *9–10

(S.D.N.Y. Oct. 16, 2006) (finding acceptance where scrolling though thirty-eight screens of text

was required—essentially the entire agreement); *Moore v. Microsoft Corp.*, 741 N.Y.S.2d 91, 92

(N.Y. App. Div. 2d Dep't 2002) (contract formed when "[t]he terms of the [agreement] were

prominently displayed on the program user's computer screen before the software could be

installed," and "the program's user was required to indicate assent to the [agreement] by clicking

on the 'I agree' icon before proceeding with the download"); *In re RealNetworks, Inc.*, No. 00-

CV-1366, 2000 WL 631341, at *6 (N.D. Ill. May 8, 2000) (approving license agreement placed

in pop-up window with scroll bar); *cf. Serrano v. Cablevision Sys. Corp.,* 863 F. Supp. 2d 157,

164–65 (E.D.N.Y. 2012) (approving agreement where plaintiff noted that upon initiation of

internet service, she was "provided with an electronic copy of Cablevision's Terms of Service"

and was required "to indicate that [she] reviewed and agreed to the Terms of Service by clicking

on a link marked 'Agree'").

  Reference to scrollwrap agreements as clickwraps is misleading.  *Cf.* Juliet M.

Moringiello and William L. Reynolds, *From Lord Coke to Internet Privacy: The Past, Present,*

*and Future of the Law of Electronic Contracting*, 72 Md. L. Rev. 452, 466 (2013) ("In the world

of electronic contracts . . . clickwrap is a meaningless term.  Click-to-agree transactions come in

many flavors.  Sometimes the click is at the end of the terms so that a reader must at least scroll

through to reach the 'I agree' icon, while [at] other times the click is next to a hyperlink that

leads to the terms, either in one click or in several.  Whether the terms are classified as clickwrap says little about whether the offeree had notice of them.").

### d.  Sign-in-wrap

A questionable form of internet contracting has been used in recent years—sign-in-wraps. These internet consumer contracts do not require the user to click on a box showing acceptance of the "terms of use" in order to continue.  Rather, the website is designed so that a user is notified of the existence and applicability of the site's "terms of use" when proceeding through the website's sign-in or login process.  Courts of Appeals have yet to rule on the validity and enforceability of the terms of such contracts.

*Fteja v. Facebook, Inc.* supported enforceability of sign-in-wraps.  *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829 (S.D.N.Y. 2012) (applying both New York and California law).  In the *Fteja* case, the plaintiff claimed emotional distress and reputational damage when defendant Facebook disabled his account on its social networking service.  *Id.* at 831.  Facebook moved to transfer the case to the Northern District of California.  *Id.* at 831–32.  Facebook relied upon the forum selection clause in its "terms of service."  *Id.* at 834.  Plaintiff countered that he had not accepted the terms.  *Id*.  The court noted that the manner in which Facebook designed its website to give users notice of its "terms of service" did not fall neatly into either the browsewrap or clickwrap category:

> A putative user is asked to fill out several fields containing personal and contact information. . . .  The putative user is then asked to click a button that reads "Sign Up."  After clicking this initial "Sign Up" button, the user proceeds to a page entitled "Security Check" that requires a user to reenter a series of letters and numbers displayed on the page.  Below the box where the putative user enters that letter-number combination, the page displays a second "Sign Up" button similar to the button the putative user clicked on the initial page.  The following sentence appears immediately below that button: "By clicking Sign Up, you

> are indicating that you have read and agree to the Terms of Service." The phrase "Terms of Service" is underlined, an indication that the phrase is a hyperlink, a phrase that is usually highlighted or underlined and sends users who click on it directly to a new location—usually an internet address or a program of some sort.
>
> In order to have obtained a Facebook account, [plaintiff] must have clicked the second "Sign Up" button. Accordingly, if the phrase that appears below that button is given effect, when [plaintiff] clicked "Sign Up," he indicat[ed] that [he] ha[d] read and agree[d] to the Terms of Policy.

*Id.* at 834–35. The court deemed this internet consumer contract construction a hybrid of browsewrap and clickwrap. *Id.* at 838. It noted:

> Facebook's Terms of Use are somewhat like a browsewrap agreement in that the terms are only visible via a hyperlink, but also somewhat like a clickwrap agreement in that the user must do something else—click "Sign Up"—to assent to the hyperlinked terms. Yet, unlike some clickwrap agreements, the user can click to assent whether or not the user has been presented with the terms.

*Id.* Analogizing terms found through a hyperlink to terms found on the back of the ticket in *Carnival Cruise*, *see supra* Part V.B.2.b, the court held in *Fteja* that the plaintiff was bound by the forum selection clause:

> What is the difference between a hyperlink and . . . a cruise ticket saying "SUBJECT TO CONDITIONS OF CONTRACT ON LAST PAGES IMPORTANT! PLEASE READ CONTRACT–ON LAST PAGES 1, 2, 3"? The mechanics of the internet surely remain unfamiliar, even obtuse to many people. But it is not too much to expect that an internet user whose social networking was so prolific that losing Facebook access allegedly caused him mental anguish would understand that the hyperlinked phrase "Terms of Use" is really a sign that says "Click Here for Terms of Use." So understood, at least *for those to whom the internet is an indispensable part of daily life, clicking the hyperlinked phrase is the twenty-first century equivalent of turning over the cruise ticket.* In both cases, the consumer is prompted to examine terms of sale that are located somewhere else. Whether or not the consumer bothers to look is irrelevant. "Failure to read a contract before

> agreeing to its terms does not relieve a party of its obligations under the contract."

*Id.* at 839 (emphasis added) (citations omitted).

The phrase "for those to whom the internet is an indispensable part of daily life" in *Fteja* is curious. It presupposes intensive and extensive use of the internet, an assumption not easily justifiable when the user is buying only one or a few items through this system. What of those less devoted to computers? Should a survey be taken on how they view some of these directions? Judges and law clerks tend to be sophisticated about navigating the internet and website. Are they attributing their superior knowledge to that of "read-less and run" types? A "hyperlink," which is activated by clicking on an underlined word or term, with its serious legal ramifications, may not be fully understood by many consumers. *See generally supra* Part IV.

Lower courts upholding sign-in-wrap arrangements, such as the one presented in *Fteja*, have done so under three circumstances. They emphasized notice and an effective opportunity to access terms and conditions.

*First*, where the hyperlinked "terms and conditions" is next to the only button that will allow the user to continue use of the website. *See*, *e.g.*, *Crawford v. Beachbody, LLC*, No. 14-CV-1583, 2014 WL 6606563, at *3 (S.D. Cal. Nov. 5, 2014) (forum selection clause binding where consumer clicked on button marked "Place Order" and above button was statement informing user that by clicking the button user was subject to the website's "terms and conditions," which were available in the same screen via hyperlink); *Starke v. Gilt Group, Inc.*, No. 13-CV-5497, 2014 WL 1652225, at *2–3 (S.D.N.Y. Apr. 24, 2014) (arbitration clause in "terms of use" binding where consumer clicked "Shop Now" button next to statement that informed user that "the consumer will become a Gilt member and agrees to be bound by the "Terms of Membership," which were available next to the button as a hyperlink); *Swift v. Zynga*

*Game Network, Inc.*, 805 F. Supp. 2d 904, 908, 912 (N.D. Cal. 2011) (arbitration clause enforceable where user clicked on button marked "accept," below which was statement in small grey font indicating that clicking on the button meant accepting the hyperlinked "terms of service").

*Second*, where the user "signed up" to the website with a clickwrap agreement and was presented with hyperlinks to the "terms of use" on subsequent visits.  *See*, *e.g.*, *Nicosia v. Amazon.com, Inc.*, No. 14-CV-4513, 2015 WL 500180, at *7 (E.D.N.Y. Feb. 4, 2015) (arbitration clause enforceable where user clicked box acknowledging terms at initial signup to website and was presented with hyperlink at top of webpage to "terms of use" multiple times after completing purchases), *appeal filed*, No. 15-CV-0423 (2d Cir. Feb. 13, 2015); *Zaltz v. JDATE*, 952 F. Supp. 2d 439, 454 (E.D.N.Y. 2013) (forum selection clause binding where user had to assent to clickwrap agreement and clicked button marked "accept," next to which was hyperlink to "terms of use," to sign up to website and to renew her membership).

*Third*, where notice of the hyperlinked "terms and conditions" is present on multiple successive webpages of the site.  *See, e.g.*, *Major v. McCallister*, 302 S.W.3d 227, 230–31 (Mo. Ct. App. S. Dist. 2009) (forum selection clause enforceable where hyperlink to "terms and conditions" was presented on multiple successive webpages and the final step in the website's signup process was to click a button next to which was the phrase:  "By submitting you agree to the Terms of Use").

### e.  General Principles

The following general principles regarding the validity and enforceability of internet agreements emerge from an analysis of the cases:

*First*, "terms of use" will not be enforced where there is no evidence that the website user had notice of the agreement; "the validity of the [internet] agreement turns on whether the website puts a *reasonably prudent user* on inquiry notice of the terms of the contract." *Nguyen*, 763 F.3d at 1177 (emphasis added) (collecting cases).

*Second*, "terms of use" will be enforced when a user is encouraged by the design and content of the website and the agreement's webpage to examine the terms clearly available through hyperlinkage. *See, e.g.*, *Ticketmaster Corp.*, 2003 WL 21406289, at *2 (noting that the warning on website that further use binds a user to the "terms of use" "could not be missed"); *see also cf.* Woodrow Hartzog, *Website Design as Contract*, 60 Am. U. L. Rev. 1635, 1664–70 (2011) (discussing features of website design that hinder understanding of privacy policies).

*Third*, "terms of use" will not be enforced where the link to a website's terms is buried at the bottom of a webpage or tucked away in obscure corners of the website where users are unlikely to see it. *See, e.g.*, *Specht*, 306 F.3d at 23 (refusing to enforce "terms of use" that "would have become visible to plaintiffs only if they had scrolled down to the next screen"); *In re Zappos.com*, 893 F. Supp. 2d at 1064 ("The Terms of Use is inconspicuous, buried in the middle to bottom of every Zappos.com webpage among many other links, and the website never directs a user to the Terms of Use."); *Van Tassell*, 795 F. Supp. 2d at 792–93 (refusing to enforce arbitration clause in internet agreement that was only noticeable after a "multi-step process" of clicking through non-obvious links); *Hines*, 668 F. Supp. 2d at 367 (plaintiff "could not even see the link to [the terms and conditions] without scrolling down to the bottom of the screen—an action that was not required to effectuate her purchase").

### 4. Assessing Validity and Enforceability of Electronic Adhesion Contracts

Analyzing established common law contract formation doctrine, alongside the general contract principles and cases regarding inquiry notice and the validity and enforceability of

internet agreements, the following four-part inquiry in analyzing sign-in-wraps, and electronic contracts of adhesion generally, is required:

(1)   Aside from clicking the equivalent of sign-in (*e.g.*, log-in, buy-now, purchase, etc.), is there substantial evidence from the website that the user was aware that she was binding herself to more than an offer of services or goods in exchange for money?  If not, the "terms of use," such as those dealing with venue and arbitration, should not be enforced against the purchaser.

(2)   Did the design and content of the website, including the homepage, make the "terms of use" (*i.e.*, the contract details) readily and obviously available to the user?  If not, the "terms of use," such as those dealing with venue and arbitration, should not be enforced against the purchaser.

(3)   Was the importance of the details of the contract obscured or minimized by the physical manifestation of assent expected of a consumer seeking to purchase or subscribe to a service or product?  If yes, then the "terms of use," such as those dealing with venue and arbitration, should not be enforced against the purchaser.

(4)   Did the merchant clearly draw the consumer's attention to material terms that would alter what a reasonable consumer would understand to be her default rights when initiating an online consumer transaction from the consumer's state of residence:  The right to (a) not have a payment source charged without notice (*i.e.*, automatic payment

renewal); (b) bring a civil consumer protection action under the law of
her state of residence and in the courts in her state of residence; and
(c) participate in a class or collective action?  If not, then (a), (b), or (c)
should not be enforced against the consumer.

It is desirable to have hard-edged rules of adhesion that apply no matter what the
consumer's background.  Such rules reduce substantial litigation costs.  But, until useful
consumer studies demonstrate that average consumers using the computer understand what
contract terms are being accepted when a purchase is made, preemptive rules in favor of vendors
who do not forcefully draw purchasers' attention to terms disadvantageous to them should be
rejected.  *See supra* Part IV.  The burden of showing agreement to details of a contract on a
website's contract of adhesion is on the vendors.  It is the vendor who designs the website and
puts into it terms favoring itself.

Proof of special know-how based on the background of the potential buyer or adequate
warning of adverse terms by the design of the agreement page or pages should be required before
adverse terms, such as compelled arbitration or forced venue, are enforced.

### C.  Application of Law to Facts

#### 1.  Plaintiff Welsh

The evidence presented to date does not demonstrate that Welsh agreed to Gogo's
"Terms of Use."  In August 2011, Welsh was presented with an account creation page.  *See
supra* Part III.C.2.  He was required to fill in all fields marked with an asterisk.  *Id.*  The
clickwrap agreement box next to the hyperlinked statement, "I agree to the Terms of Use," did
not have an asterisk.  *Id.*  Whether Welsh's assent was required in order to create an account and
purchase in-flight Wi-Fi in August 2011 is contested.  *See supra* Part III.C.1.  The court cannot

assume that Welsh affirmatively clicked the box and intended to be bound to the company's "Terms of Use," which were in effect in 2011. *Id.*

Limited discovery to determine Welsh's background and experience, and what he knew about ordering from a computer, may be allowed by the magistrate judge.

Welsh is not precluded from bringing the alleged putative class claims in this court at this point in the proceedings. Motions to dismiss may be renewed after discovery is completed.

### 2. Plaintiff Berkson

The sign-in-wrap at issue in Berkson's case most closely resembles the online contract discussed in *Fteja*. *See supra* Parts III.D.1 & V.B.3.d. But *Fteja*, and lower court cases that follow its lead, mischaracterize important Supreme Court and Court of Appeals precedent regarding contracts and the reasonable person standard that must be applied to inquiry notice of, and manifestation of assent to, the terms in a contract of adhesion. The offeror must show that a reasonable person in the position of the consumer would have known about what he was assenting to. *See supra* V.B.2.b & e.

There are significant differences between a hyperlink available near a sign-in button, which is never subsequently mailed in hardcopy or softcopy to a consumer, as is the case here, and a hardcopy cruise ticket saying in all caps, "SUBJECT TO CONDITIONS OF CONTRACT ON LAST PAGES IMPORTANT! PLEASE READ CONTRACT ON LAST PAGES 1, 2, 3." *Carnival Cruise*, 499 U.S. at 587.

*First*, the hyperlink presented to Berkson was not related to an in-person transaction. This is not a contract of adhesion situation where a cashier "cannot be expected to read legal documents to customers before ringing up sales." *Hill*, 105 F.3d at 1149.

*Second*, Gogo did not have a practice of emailing or mailing the contents of the "terms of use" to its customers.  Berkson never had a hardcopy in his possession to refer to.  *See supra* Part III.B.

*Third*, Gogo did not make an effort to draw Berkson's attention to its "terms of use."  The hardcopy ticket in *Carnival Cruise* announced its terms by (1) using the word "contract" twice; (2) addressing the reader in all caps; (3) indicating where to find the contract; and (4) inserting the word "important" and the phrase "please read." The "terms of use" presented to Berkson, aside from assuming the consumer's knowledge of the significance of a hyperlink, had none of the precautions taken by Carnival Cruise Lines Inc.  *See Carnival Cruise*, 499 U.S. at 587; *see supra* Part III.D.

The contract scenario in *Carnival Cruise* should not be analogized to electronic websites' contracts of adhesion.  It is inapposite.  Crucially, respondents in *Carnival Cruise* "conceded that they were given notice of the forum provision."  *Carnival Cruise*, 499 U.S. at 595.  This is not true in the instant case.

Applying the proposed framework for analyzing sign-in-wrap agreements to Berkson, *see supra* Part V.B.4, it is necessary to decide whether sufficient evidence has been proffered by defendants demonstrating that Berkson knew he was binding himself to more than a one-time offer of service in exchange for money.  The evidence to date indicates that he was unaware.

Next considered is the design and content of the website when it was accessed by Berkson in September 2012, and the steps taken by Gogo to draw consumers' attention to the automatic payment renewal policy, the venue provision, and the arbitration clause.  It cannot be taken for granted that Berkson clicked on the "SIGN IN" button on the lower left hand corner of the website, which indicated that by clicking "Sign in" he was agreeing to the company's "terms

of use." *See supra* Part III.D.1.  Critical is the sufficiency of the textual statement appearing in small font above the "NEXT" button on the account creation page indicating that by clicking "NEXT" Berkson was assenting to the company's "terms of use."  *Id.*  The statement is insufficient to give adequate notice.

Gogo's sign-in contract of adhesion is not binding on Berkson.  The design and content of the website, including the homepage, did not make the "terms of use" readily and obviously available to Berkson.  The hyperlink to the "terms of use" was not in large font, all caps, or in bold.  *Id.*  Nor was it accessible from multiple locations on the webpage.  *Id.*  By contrast, the "SIGN IN" button is very user-friendly and obvious, appearing in all caps, in a clearly delineated box in both the upper right hand and the lower left hand corners of the homepage.  *Id.*

The importance of the "terms of use" was obscured by the physical manifestation of assent, in this case clicking the "SIGN IN" button, expected of a consumer seeking to purchase in-flight Wi-Fi.  Once Berkson clicked "SIGN IN," the "terms of use" did not appear in a new screen or in a pop-up window on the same screen.  *Id.*  He was not required to scroll through the contract of adhesion and its boilerplate terms in order to click "accept" or "I agree."  *Id.*

Defendants' motions to transfer Berkson's claims to Illinois or, alternatively, compel arbitration are denied.  As in Welsh's case, motions to dismiss may be renewed after discovery is completed.

### 3.  Generally

Unlike the basic internet contract for a sale and payment, arbitration and forum selection clauses materially alter the substantive default rights of a consumer.  They are not enforceable against ordinary consumers who are unlikely to be aware of them.  *See supra* Part V.B.2.  Where the seller "has reason to believe that the [buyer] manifesting assent would not do so if [he knew] that the writing contained a particular term, the term is not part of the agreement."  Restatement

(Second) of Contract § 212(3); *cf. Mastrobuono*, 514 U.S. at 63 ("As a practical matter, it seems unlikely that petitioners . . . had any idea that by signing a standard-form agreement to arbitrate disputes they might be giving up an important substantive right.  In the face of such doubt, we are unwilling to impute this intent to petitioners.").

Neither Berkson nor Welsh can, at this stage of the litigation, be considered to have knowingly bound themselves to the purported terms of an agreement adverse to them.  They are not precluded from asserting the putative class claims alleged in the amended complaint.

## VI.   CONSTITUTIONAL STANDING

Defendants argue that, "in the event arbitration and transfer are not ordered," the amended complaint should be dismissed because neither plaintiff suffered an injury-in-fact, a necessary element of Article III standing.  (Defs.' Mem. of Law in Supp. of Mots. to Compel Arbitration, Transfer Venue, or, in the Alternative, Dismiss the Amended Class Action Complaint 15–17, ECF No. 25 ("Defs.' Mem.").)

### A.  Law

#### 1.  Motion to Dismiss Standard

Constitutional standing "is the threshold question in every federal case, determining the power of the court to entertain the suit."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  In order to survive a defendant's motion to dismiss for lack of subject matter jurisdiction, pursuant to Federal Civil Procedure Rule 12(b)(1), a plaintiff must allege facts "that affirmatively and plausibly suggest that it has standing to sue."  *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011).  Three constitutional requirements must be satisfied to establish standing:  (1) injury-in-fact—an injury that is "concrete and particularized" and is "actual or imminent, not conjectural or hypothetical"; (2) an injury that is fairly traceable to the challenged

action; and (3) an injury that will likely be redressed by a favorable ruling of the court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

"That a suit may be a class action adds nothing to the question of standing." *Lewis v. Casey*, 518 U.S. 343, 357 (1996) (internal quotation marks and citation omitted). "A putative class representative lacks standing to bring a claim if he or she did not suffer the injury that gives rise to that claim." *Thomas v. JPMorgan Chase & Co.*, 811 F. Supp. 2d 781, 790 (S.D.N.Y. 2011) (citation omitted) (mortgagor plaintiffs have standing to bring claim against mortgagee defendants where defendants sent notice of intent to foreclose, even if homes had not actually been foreclosed). Where multiple claims are brought at "'least one named plaintiff must have standing to pursue each claim alleged.'" *Id.* (emphasis and citation omitted).

The Supreme Court has held that "if none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendant, none may seek relief on behalf of himself or any other member of the class." *Cent. States Se. and Sw. Areas Health and Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 199 (2d Cir. 2005) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)); *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 159 (2d Cir. 2012) ("[I]n a putative class action, a plaintiff has class standing if he plausibly alleges [(1)] that he personally has suffered some actual injury as a result of the putatively illegal conduct of the defendant, and [(2)] that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants." (internal quotation marks and citations omitted)).

Present injurious effect on an individual's financial decisions is a cognizable injury in fact and presents a live controversy within the "case or controversy" limitation of Article III. *See*

*Constellation Energy Commodities Grp., Inc. v. Fed. Energy Regulatory Comm'n*, 457 F.3d 14, 20 (D.C. Cir. 2006). By extension, a delayed reimbursement of money borrowed from a credit-lender that charges interest qualifies as an injury-in-fact. *Cf. Ontario Forest Indus. Assoc. v. United States*, 444 F.Supp.2d 1309, 1323–24 (Court of Int. Trade 2006) (recognizing that delay of refund "deprives plaintiffs of the time-value of money . . . and may . . . deprive plaintiffs of money") (citing *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 287 (1997) (determining that an imposition of a tax was "plainly" a cognizable injury)).

In resolving a Rule 12(b)(1) motion to dismiss, "[t]he court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of [the] plaintiff, but jurisdiction must be shown affirmatively, and that showing [may] not [be] made by drawing from the pleadings inferences favorable to the party asserting it." *Morrison v. Nat'l Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (internal quotation marks and citation omitted). "Where subject matter jurisdiction is contested, courts are permitted to look to materials outside the pleadings, including affidavits." *DeBoe v. Du Bois*, 503 F. App'x 85, 86 (2d Cir. 2012) (citing *J.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004)).

### 2.  Putative Class Representatives Cannot Be "Picked Off" by Defendants

#### a.  Supreme Court Cases

The Supreme Court has enunciated an unambiguous rule that an offer of judgment does not render an individual plaintiff's claim moot as long as the plaintiff still has an "individual interest" in the litigation. *See Deposit Guarantee Nat'l Bank v. Roper*, 445 U.S. 326, 340 (1980); *Genesis Healthcare Corp. v. Symzcyk*, 133 S. Ct. 1523, 1532 (2012).

#### i.  *Deposit Guarantee Nat'l Bank v. Roper*

In 1980, the Supreme Court chastised a defendant which tried to "pick off" a named plaintiff by making an offer of judgment before a ruling on certification of a proposed class.

*Roper*, 445 U.S. at 339.  In *Roper*, plaintiff credit card holders sued a defendant bank, alleging

usurious finance charges, and sought class certification.  *Id.* at 327–28.

The district court denied plaintiffs' motion to certify the class but certified an order for a

discretionary interlocutory appeal.  *Id.* at 329.  Following denial of the appeal by the Court of

Appeals for the Fifth Circuit, the bank tendered the two named plaintiffs the maximum amount

each could have recovered.  *Id.* at 329–30.  Plaintiffs declined the tender.  *Id.*  Over plaintiffs'

objection, the district court entered judgment in plaintiffs' favor based upon the bank's offer,

dismissing the case.  *Id.* at 330.

Upon review of the district court's certification ruling in the Court of Appeals, the bank

argued that the case had been mooted based upon the entry of judgment in plaintiffs' favor.  *Id.*

The Court of Appeals rejected the bank's mootness argument, remanding the case with directions

to certify the class.  *Id.* at 331. The bank sought and was granted certiorari limited to the

mootness question.  *Id.*

The Supreme Court held that the district court's "entry of judgment in favor of the named

plaintiffs over their objections did not moot their private case or controversy" and that the named

plaintiffs' individual interest in the litigation—which interest derived from plaintiffs' desire to

shift part of the costs of the litigation to those who would share in its benefits if the class were

certified and ultimately prevailed—was "sufficient to permit their appeal of the adverse

certification ruling."  *Id.* at 340.

The Court reasoned that denying "the right to appeal simply because the defendant has

sought to 'buy off' the individual private claims of the named plaintiffs would be contrary to

sound judicial determination."  *Id.* at 339.

> Requiring multiple plaintiffs to bring separate actions, which
> effectively could be 'picked off' by a defendant's tender of

71

judgment before an affirmative ruling on class certification could be obtained, obviously would frustrate the objectives of class actions; moreover it would invite waste of judicial resources by stimulating successive suits brought by others claiming aggrievement.

*Id.*

### ii.   *Genesis Healthcare Corp. v. Symzcyk*

In *Symzcyk*, the Court considered whether a case brought on behalf of other similarly situated employees under the collective action provisions of the Fair Labor Standards Act ("FLSA") remains justiciable when the lead plaintiff's individual claim becomes moot. *Symzcyk*, 133 S. Ct. at 1526.  Plaintiff commenced an action on behalf of herself and other similarly situated employees seeking statutory damages for violations of the FLSA.  *Id.* at 1527. Defendants answered the complaint, simultaneously serving an offer of judgment, to be withdrawn ten days after service.  *Id*.

When plaintiff failed to respond within the ten-day window, defendants filed a motion to dismiss arguing that plaintiff's personal stake in the outcome of the lawsuit was rendered moot upon their offer of complete relief on her individual damages claim.  *Id*.  Plaintiff argued that defendants' offer was an improper "pick-off" attempt.  *Id*.  The district court concluded that the offer of judgment mooted plaintiff's suit because the offer of judgment fully satisfied the individual plaintiff's claim and no other plaintiffs had opted in.  *Id*.  The case was dismissed for lack of subject matter jurisdiction.  *Id*.

On appeal, the Court of Appeals for the Third Circuit agreed that plaintiff's claim was moot, but reversed and remanded the case to allow the plaintiff to seek "conditional certification" under the FLSA.  *Id*.  Its decision was based upon the "calculated attempts by some defendants to 'pick-off' named plaintiffs with strategic offers [of judgment] before certification

[which] could short-circuit the process and, thereby, frustrate the goals of collective actions." *Id.* Defendants sought and were granted certiorari. *Symzcyk*, 133 S. Ct. 26 (2012).

The Supreme Court noted a split amongst the circuit courts with respect to whether an unaccepted offer that fully satisfies a plaintiff's claim renders the case moot. *Symzcyk*, 133 S. Ct. at 1528. It declined to decide the question because it had not been raised in the lower courts. *Id.* at 1528–29. Leaving in force the Court of Appeals's decision that plaintiff's individual claim was moot, the Court considered whether plaintiff's "action remained justiciable based on the collective-action allegations in her complaint." *Id.* at 1529. Finding that plaintiff had no personal stake in representing putative and unnamed claimants based upon the mere presence of the collective action allegations, nor any other continuing interest which would preserve her suit because *the FLSA's* "conditional certification" *does not produce a class with independent legal status*, the Court held that the case was properly dismissed for lack of subject matter jurisdiction. *Id.* at 1529–30, 1532.

The Court distinguished this decision from *Roper*. *Id.* at 1532. It stated: "*Roper*'s holding turned on a specific factual finding that the plaintiffs' possessed a continuing personal economic stake in the litigation, even after the defendants' offer of judgment." *Id.* The Court also pointed out that class certification under Rule 23 is substantively different than the procedural mechanisms for collective actions under the FLSA. *Id.*

### b. Relevant Court of Appeals Rulings

Two principles emerge from rulings out of the Second Circuit regarding offers of judgment. *First*, an offer of judgment must fully satisfy the plaintiff's claim; a genuine dispute over whether the offer satisfies the entirety of the claim may, by itself, render case or controversy live. *See, e.g.*, *ABN Amro Verzekeringen BV v. Geologistics Am., Inc.*, 485 F.3d 85, 95 (2d Cir.

2007) (collecting cases).  *Second*, to moot a plaintiff's claim, the defendant must make an offer

of judgment; an offer of settlement is insufficient.  *See Cabala v. Crowley*, 736 F.3d 226, 230 (2d

Cir. 2013) (collecting cases).

### i.   Offers of Judgment Must Fully Satisfy Claims

The Court of Appeals for the Second Circuit has held that as long as parties have "a

practical stake in the dispute" and a court is "capable of rendering a judgment that would have a

practical effect on the legal rights of the parties," then there is "no mootness of the sort that

deprives the court of subject matter jurisdiction."  *ABN Amro*, 485 F.3d at 95.

*ABN Amro* illustrates this point.  *Id.*  Plaintiff sought damages in the amount of $500,000

on behalf of its insured for a printing press that was irreparably damaged in the course of being

shipped from Europe to the United States.  *Id.* at 90.  The insured and one of defendants, a

freight forwarder, had been operating under a series of contracts limiting the defendants' liability

per shipment to $50 in the absence of additional negotiations.  *Id.* at 89.

Upon the parties' cross-motions for summary judgment, the district court granted

defendants' motions in part; it held that defendants' liability was limited to $50 under the

contract.  *Id.* at 90.  The Court of Appeals for the Second Circuit declined to hear an

interlocutory appeal on the issue of liability.  *Id.* at 92.  Defendants, at the district court's

suggestion, each tendered $50 to satisfy the judgment and moved to dismiss the action.  *Id.*  The

district court then entered judgment in favor of plaintiff for $50 from each of defendants and

dismissed with prejudice plaintiff's claims of damages above $50.  *Id.*  The district court pointed

out that since plaintiff had a judgment for all that could be "recover[ed] if the case were tried,"

none of the parties had a "legally cognizable interest in the outcome" and the court no longer had

subject matter jurisdiction.  *Id.*  Plaintiff appealed, arguing that the district court erred in entering

judgment without making defendants concede liability, and also challenged the court's decision to limit defendants' liability.  *Id.*

The Court of Appeals for the Second Circuit affirmed the district court's conclusions as to liability and final judgment, but disagreed with the court's reasoning.  *Id.* at 94.  It held that the district court was mistaken in finding that the case was moot and that the court lacked subject matter jurisdiction. *Id.*  "The [district] court confused the mootness *of an issue* with mootness of a case or claim in the Constitutional sense." *Id.* (emphasis in original).  The court elaborated that mootness in the Constitutional sense arises when the parties no longer have a "legally cognizable interest" or "practical personal stake" in the dispute, so that a court's judgment would be unable to "affect the legal rights as between the parties." *Id.*

Applying this principle, the Court of Appeals held that even though the *issue* of liability was rendered moot by the district court's decision and the defendant's tender of judgment, the *case* was not moot because plaintiff still sought $500,000 in damages.  A "case or controversy" remained over which the district court had subject matter jurisdiction. *Id.* at 95.  Therefore the district court's statement that the court's judgment was "not based on the merits but . . . solely on . . . mootness" was in error. *Id.* at 96.

### ii. Acceptance of an Offer of Settlement Does Not Necessarily Moot a Case or Controversy

In this circuit, "resolving all points in dispute and leaving no conflict over the 'nature and form' of settlement," is an offer of judgment; an "offer of an informal settlement without judgment" is insufficient to moot a controversy.  *Cabala*, 736 F.3d at 230.

In *Cabala*, the plaintiff had sought damages for defendant's alleged violation of the Fair Debt Collection Practices Act ("FDCPA").  *Id.* at 227.  Less than two months after the complaint was filed, the defendant offered to settle the case for $1,000 in statutory damages and plaintiff's

costs and attorney's fees, to be determined by the court.  *Id.*  In light of the offer, defendant's attorney indicated he would not be responsible for attorney's fees accruing thereafter.  *Id.* Plaintiff responded requesting a lump sum settlement, including attorney's fees and costs.  *Id.* Defendant insisted that the fee amount be resolved by the court.  *Id.*  But, the court would not consider the fee application without a judgment, which defendant admittedly wished to avoid. *Id.* at 227–28.  Unable to resolve the fee amount, the parties stipulated to judgment in favor of plaintiff for maximum statutory damages, and made a fee application to the court.  *Id.* at 228.

Litigation over the amount of the fee award raised the claim that the original settlement offer had not been communicated to plaintiff.  *Id.*  "The district court, observing that there was a sincere dispute over the 'nature and form' of the settlement—specifically about whether the settlement would include a judgment that would make the attorney's fee award judicially enforceable—concluded that [the] original offer did not moot the action."  *Id.*  The court found the fee request reasonable and ordered payment of the full amount.  *Id.*

On appeal, the Court of Appeals for the Second Circuit affirmed the district court's fee award, holding that defendant's initial offer of judgment did not fully resolve the dispute between the parties.  *Id.* at 231.  It was not *per se* unreasonable that the fee award included work performed after the defendant proffered the original settlement offer.  *Id.*

### c.  Other Court Decisions

In cases brought pursuant to a consumer protection statute and in the absence of a definitive ruling on the effect of offers of judgment to named plaintiffs who seek to represent a putative class, "district courts in th[e] [Second] Circuit are split on the question of whether an offer of judgment to an individual plaintiff made while a certification motion is pending or before a certification motion is filed moots the putative class action."  *Franco v. Allied Interstate*

*LLC*, No. 13-CV-4053, 2014 WL 1329168, at *3 (S.D.N.Y. Apr. 2, 2014) (collecting cases).  *See also Jones-Bartley v. McCabe, Weisberg & Conway, P.C.*, No. 13-CV-4829, 2014 WL 5795564, at *15 (S.D.N.Y. Nov. 6, 2014) ("[N]either the Supreme Court nor the Second Circuit has ruled on whether class claims should be dismissed . . .  when a[n] offer of judgment for full relief is made . . .  prior to the filing of a motion for class certification . . . ." (internal quotation marks and citation omitted)).

In *Kagan v. Gibraltar Sav. & Loan Assn.*, the Supreme Court of California did not countenance defendant's "simple expedient of offering plaintiff . . . individual relief" as a tactic used "to oust" her as the representative of the class.  *Kagan v. Gibraltar Sav. & Loan Assn.*, 35 Cal. 3d 582, 590 (Cal. 1984).  Defendant's "pick off" attempt, prompted by its receipt of the class demand notice, was ruled impermissible.  *Id.* at 589.  The court held that because defendant did not attempt to remedy its actions as to the entire class as required by the CLRA, plaintiff could still act as a representative for the class.  *Id.* at 592.  The court further held that "we interpret broadly the [standing] requirement of [the CLRA] that a consumer 'suffer [ ] any damage' to include the infringement of any legal right as defined by [the CLRA]."  *Id.* at 593.

The California Supreme Court in *Meyer v. Sprint Spectrum L.P.* disapproved of Kagan's broad construction of the standing provision, "declin[ing] to extend Kagan to situations in which an allegedly unlawful practice under the CLRA has not resulted in some kind of tangible increased cost or burden to the consumer."  *Meyer v. Sprint Spectrum L.P.*, 200 P.3d 295, 301, 303 (Cal. 2009).  It reaffirmed that "if the action is filed as a class action lawsuit, [the CLRA] makes clear that individual settlement will not undermine a plaintiff's status as a legitimate class representative."  *Id.* at 303.

### 3.   Putative Class Representatives Cannot Be Paid Off By Sidestepping No-Contact Rule

Relevant is the no-contact rule, which was designed to prevent attorneys from "obtaining a tactical advantage by knowingly contacting a represented party without notifying her lawyer." *Velez v. Novartis Pharmaceutical Corp.*, No. 04-CV-9194, 2010 WL 339098, at *3 (S.D.N.Y. Jan. 26, 2010) (collecting cases).

Federal law controls the conduct of attorneys in federal courts. *In re Snyder*, 472 U.S. 634, 645 n.6 (1985). Local Rule 1.5(b)(5) of the Southern and Eastern Districts of New York, for example, mandates that the New York State Rules of Professional Conduct apply within this court. S. & E.D.N.Y. Civ. R. 1.5(b)(5). The "No-Contact Rule" of New York, Rule 4.2, states:

> In representing a client, a lawyer shall not communicate or cause another to communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the prior consent of the other lawyer or is authorized to do so by law.

N.Y. R.P.C. 4.2(a). An offer of settlement and judgment must be made through a party's attorney.

Comment 8 to the Model Rules of Professional Conduct Rule 4.2, whose identical language served as the basis for New York Rule 4.2, and counterpart rules in California, Cal. R.P.C. R. 2-100(a), and Illinois, Il. R. S. Ct. R.P.C. R. 4.2, reads:

> The prohibition on communications with a represented person only applies in circumstances where the lawyer knows that the person is in fact represented in the matter to be discussed. This means that the lawyer has actual knowledge of the fact of the representation; but such actual knowledge may be inferred from the circumstances. . . . Thus, the lawyer cannot evade the requirement of obtaining the consent of counsel by closing eyes to the obvious.

M.R.P.C. R. 4.2 cmt. 8.

Rule 4.2 has its foundation in Canon 9 of the 1908 ABA Canons of Professional Ethics. ABA Canons of Professional Ethics No. 9 (1908).  It stated that "[a] lawyer should not in any way communicate upon the subject of controversy with a party represented by counsel; much less should he undertake to negotiate or compromise the matter with him, but should deal only with his counsel."  *Id.*  This Canon was effectively treated as a rule of evidence, with courts using it to determine whether they could admit into evidence statements elicited from an individual in the absence of her attorney when it was known by the interrogating party that the individual had representation.  *See*, *e.g.*, *Reinke v. United States*, 405 F.2d 228, 230 (9th Cir. 1968) (discussing whether Canon 9 applies to exclude from evidence statements made by plaintiff to FBI agent who knew plaintiff had representation).  After the creation of the ABA Model Code of Professional Responsibility in 1970, the Canon was expanded into today's formulation of a prophylactic "no-contact" rule.  *See* Geoffrey C. Hazard, Jr. and Dana Remus Irwin, *Toward a Revised 4.2 No-Contact Rule*, 60 Hastings L.J. 797, 799 (2009).

The no-contact rule serves several important ends.  It prevents attorneys from exploiting the disparity in legal skills between attorneys and laypeople.  *Polycast Technology Corp. v. Uniroyal, Inc.*, 129 F.R.D. 621, 625 (S.D.N.Y. 1990) (collecting cases).  It preserves the integrity of the attorney-client relationship.  *Id.*  It may assist settlement by routing disputes through lawyers accustomed to the negotiation process.  *Id.*

Obtaining a tactical advantage by knowingly contacting a represented party without notifying her lawyer is impermissible.  It will lead courts, when necessary, to protect the integrity of dispute resolution, including discounting the relevance of actions taken in violation of the rule. *See*, *e.g.*, *Papanicolaou v. Chase Manhattan Bank, N.A.*, 720 F. Supp. 1080, 1088 (S.D.N.Y.

1989) (deleting some depositions from the record in response to law firm's violation of the no-contact rule).

### B. Application of Law to Facts

#### 1. Plaintiff Welsh

Welsh has sufficiently established Article III standing.

Defendants' argument that Welsh has been fully reimbursed for the injuries sustained by the company does not defeat his standing. (Defs.' Mem. 16.) Claiming that Welsh was reimbursed the full amount of his claim after July 30, 2013, when Gogo was put on notice that he would be the named plaintiff in a federal class action complaint, does not qualify as a full refund. *See supra* Part III.C. Picking off named plaintiffs by offering them a payout prior to the filing of a class certification motion is not an acceptable practice when it has the effect of preventing a viable class action from proceeding. *See supra* Part VI.A.2.

Alternatively, Gogo's violation of the no-contact rule, which occurred when it allegedly communicated directly with Welsh, renders the check delivered to him—sent after Gogo received notice from Welsh's attorney of his client's intention to file a putative class action—irrelevant for the purposes of this class action litigation. *See supra* Part VI.A.3.

Welsh has a live controversy before this court that has not been mooted by defendants' actions.

#### 2. Plaintiff Berkson

Berkson has experienced sufficient injury to be accorded Article III standing.

Defendants essentially argue that, because a third party credit card company reimbursed Berkson for the alleged unauthorized charges he incurred in the amount of $104.85, he cannot satisfy the injury-in-fact requirement of constitutional standing. (Defs.' Mem. 16.) This reasoning would allow corporations like Gogo to use credit card companies, which would

generally not have standing to pursue reimbursement claims on their own behalf, as a shield to liability.  *See Spiro v. Healthport Techs., LLC*, No. 14-CV-2921, 2014 WL 4277608, at *5 (S.D.N.Y. Aug. 29, 2014) ("[A] discretionary decision after-the-fact to reimburse another party for a charge [does not] confer[] standing on the reimbursing entity . . . .  Imagine, for example, a person who took a taxi home one night, and was overcharged for the taxi ride in violation of local law.  If the person was later voluntarily reimbursed for that cost—by a friend, parent, employer, stranger, or Good Samaritan—that reimbursing entity [does not] have the legal right to sue the cab driver for overcharging. . . .  Absent assignment of a legal right to sue for such relief, . . . the mere act of making a third-party whole for an expense incurred and already paid does not entitle the paying party to the right to challenge that expense.")

In criminal law, a victim is found to suffer loss at the time his credit card is charged.  *See*, *e.g.*, *United States v. Goldstein*, 442 F.3d 777, 784 (2d Cir. 2006) (holding that evidence that victims suffered loss at the time their credit cards were charged, though ultimately no financial loss resulted, was sufficient to support conviction for access device fraud).  "Loss" in the device fraud context is measured on the date a credit card transaction occurs; a consumer's "later efforts to mitigate the loss through other means [are] irrelevant."  *Id.* (citing *United States v. Bald*, 132 F.3d 1414, 1416–17 (11th Cir. 1998)).

Assessment of loss in the criminal context is applicable by analogy to the civil context. The present injurious effect on an individual's financial decisions is a cognizable injury-in-fact. *See Constellation Energy Commodities*, 457 F.3d at 20.  It presents a live controversy within the "case or controversy" limitation of Article III.  *Id.*  Delayed reimbursement of money borrowed from a credit-lender that may charge interest qualifies as an injury-in-fact.  *Cf. Ontario Forest Indus. Assoc. v. United States*, 444 F. Supp. 2d at 1323–24 (recognizing that delay of refund

"deprives plaintiffs of the time-value of money . . . and may . . . deprive plaintiffs of money")
(citing *Gen. Motors Corp.*, 519 U.S. at 287 (determining that an imposition of a tax was
"plainly" a cognizable injury)).  Running up unjustified credit charges may adversely affect a
consumer's credit standing.

To measure particularized injury in the civil context differently than in the criminal
context with respect to the unauthorized use of credit cards would result in a perverse outcome,
essentially serving to penalize consumers for attempting to mitigate their losses by appealing to
their credit card companies for a reimbursement.  A consumer suffers an injury-in-fact on the
date a merchant charges his or her credit card without authorization.  Absent an assignment of a
legal right to sue for relief, a third party that makes an "after-the-fact decision to reimburse
another party for a[n] unauthorized charge" does not itself have standing to sue.  *See Spiro*, 2014
WL 4277608, at *5.

Berkson claims that on September 25, 2012, the day he subscribed to Gogo's in-flight
Wi-Fi, he did not authorize defendants to bill his credit card every month.  *See supra* Part III.D.
He reasonably understood that he was going to be charged only for a one-month subscription to
the service.  *Id*.  The company admits that it charged him $34.95 on October 25, 2012, November
26, 2012, and December 25, 2012.  *Id.*

Although American Express reimbursed Berkson for $104.85, he suffered particularized
injury traceable to Gogo on each day defendant allegedly billed unauthorized charges to his
credit card.  *Id.*

## VII.  DISPOSITION OF REMAINING CLAIMS

Defendants' arguments under Federal Civil Procedure Rule 12(b)(6) are all premised on
the existence of a valid and enforceable contract and lack of standing.  These arguments have
been rejected.

Separate detailed analysis of each cause of action contained in the amended complaint is not required at this time. *See Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003) (holding that the standard of review on a motion to dismiss under Federal Civil Procedure Rule 12(b)(6) for failure to state a claim upon which relief can be granted is "substantively identical" to the Federal Civil Procedure Rule 12(b)(1) standard). *See also Faber v. Metro. Life*, 648 F.3d 98, 104 (2d Cir. 2011) (finding that under Rule 12(b)(6), the court should "draw all reasonable inferences in [p]laintiff's favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." (internal quotation marks omitted)).

Gogo Inc. is not being dismissed from the action at this time. Gogo Inc.'s S-1 suggests it does not operate independently from Gogo LLC. *See supra* Part III.E.

## VIII.   CONCLUSION

Berkson and Welsh have standing.

Transfer of venue and compelling arbitration are denied.

A hearing on class certification is scheduled for July 9, 2015 at 10:00 a.m. All related briefing shall be submitted to the court by June 19, 2015.

Any disputes related to the briefing schedule or discovery are respectfully referred to the magistrate judge for decision.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Date:   April 8, 2015
        Brooklyn, New York